564 So.2d 387 (1990)
EXXON CORPORATION
v.
The Honorable Herbert W. THOMPSON, Commissioner of Conservation and Assistant Secretary, Department of Natural Resources of the State of Louisiana.
No. CA 88 0310.
Court of Appeal of Louisiana, First Circuit.
June 27, 1990.
*388 William S. Strain, Baton Rouge, for plaintiff-appellant Exxon Corp.
Kerry M. Massari, Lafayette, for amicus curiae Marion Epley, Jr., et al.
George C. Gibson, New Orleans, for defendant-appellee Herbert W. Thompson.
B.J. Duplantis, Lafayette, David Ellison, Jr., Baton Rouge, for defendants-appellees William Louis Albritton, Andrew Stirling Albritton, Fidelity Nat. Bank of B.R., Mary Louise Albritton LeBlanc, and Carol Stewart Albritton.
Before EDWARDS, WATKINS, CARTER, LANIER and CRAIN, JJ.
CARTER, Judge.
This appeal involves a dispute over the proceeds of the production of a natural gas well from the date of initial production, August 1, 1984, until the date of unitization, October 23, 1984. Exxon Corporation (Exxon) appeals from a district court judgment, upholding an order of the Louisiana Commissioner of Conservation (Commissioner), which mandated that the proceeds from production of the natural gas well be distributed in accordance with the order effective on October 23, 1984.

FACTS AND PROCEDURAL HISTORY
This dispute is the outgrowth of a change in the generally accepted practice which governs the granting of allowables for the production of oil and gas within Louisiana. Exxon is the owner of land upon which the well, Exxon Fee No. 59 (Exxon 59), is located. Prior to the drilling of Exxon 59, Exxon drilled and completed the well, Marion J. Epley No. 1 (Epley 1), on lands adjacent to those of Exxon 59. After the completion of Epley 1, the Commissioner unitized production from Epley 1 in Order No. 1239 creating three (3) drilling and production units for areas to be drained by Epley 1.
Subsequent to this order, Exxon applied for a permit to drill Exxon 59 on non-unitized land adjacent to the three (3) units created by Order No. 1239. After drilling Exxon 59, Exxon, through written notice, on July 3, 1984, advised the Commissioner that it intended to make application to the Commissioner for a public hearing to unitize and incorporate a proposed additional unit to be included in the field designated in Order No. 1239. On July 12, 1984, Exxon informed interested parties that a pre-hearing conference would be held on July 23, 1984. At the pre-hearing conference *389 Exxon was made aware of the opposition to the production of Exxon 59 on the "lease" unit basis suggested in Exxon's application. Particularly, Mr. O.R. Carter, representing the Albritton interests, suggested that there was sufficient information to proceed with a "geologic" rather than "lease" basis for unitization of Exxon 59. No agreement was reached, and Exxon decided to proceed with their application on a "lease" basis. On July 24, 1984, Exxon formally applied for a public hearing on their proposal to add and unitize, on a "lease" basis, an additional unit on a lease basis to the three units created in Order No. 1239. On August 13, 1984, in compliance with statewide Order No. 29-F, Exxon filed its proposed acreage plat with the Office of Conservation. On August 22, 1984, Exxon requested clearance for a production allowable on Exxon 59.
Prior to the occurrence of these events, the Commissioner at that time, Mr. Patrick Martin, in an unrelated proceeding had written a letter to Amoco Production Company informing them of his opposition to the granting of lease basis allowables pending application for unitization of the pool.
On April 14, 1983, Mr. J.W. Hecker, the Chief Engineer of the Office of Conservation, issued a memorandum to all district managers of the Office of Conservation, attaching a copy of Commissioner Martin's letter to Amoco. The memorandum instructed the district managers to deny, in the future, allowables after a pre-application notice of hearing had been filed, unless there was an agreement, allocating the production on the basis of the unit which would ultimately be created.
As a response to that memorandum and Exxon's application for an allowable, the Commissioner, on September 21, 1984, granted an allowable which was conditioned upon Exxon's acceptance of a pay out of proceeds from production from Exxon 59 in compliance with the unit to be created after the public hearing. Exxon consistently challenged the authority of the Commissioner to issue conditional allowables, which require disbursal of funds in accordance with a unit not yet in existence.
After public hearing on the matter, the Commissioner issued Order No. 1239-A, which dissolved the previous three (3) "geographic" units established in Order No. 1239 and reconstituted one geologic unit encompassing both Epley 1 and Exxon 59. Order No. 1239-A also pretermitted the question of whether the Commissioner had the power to allocate production on Exxon 59 prior to the effective date of unitization. On March 4, 1986, after hearing, the Commissioner issued Order No. 1239-A-1 which found that production of Exxon 59 from August 1, 1984, to October 23, 1984, should be shared on the basis of the unit created by Order No. 1239-A.[1]
Exxon challenged this order in a proceeding before the District Court, which affirmed the Order of the Commissioner. Thereafter, Exxon appealed to this court, challenging the authority of the Commissioner to issue an order which purports to force it to share production from a well prior to the effective date of unitization.

VALIDITY OF THE COMMISSIONER'S ORDER
Exxon contends the trial court erred when it upheld the validity of Order No. 1239-A-1. Exxon asserts that: (1) the Commissioner had no statutory authority to effect retroactive unitization; (2) the policy, which provided the basis for Order No. 1239-A-1, was adopted in violation of the Louisiana Administrative Procedure Act, La.R.S. 49:950 et seq.; (3) retroactive unitization is constitutionally infirm; (4) the Commissioner's ruling was arbitrary and capricious and took Exxon's property without due process; and (5) the Commissioner's ruling resulted in a denial of equal protection of the law for Exxon.
The basic issue in this case is the proper interpretation of the provisions of the Louisiana Civil Code, the Louisiana Mineral, Oil and Gas Conservation Law (Subtitle I of *390 Title 30 of the Revised Statutes), and the Louisiana Mineral Code (Title 31 of the Revised Statutes). The general rules for the interpretation of statutes are set forth in Bunch v. Town of St. Francisville, 446 So.2d 1357, 1360 (La.App. 1st Cir.1984) as follows:
When a law or ordinance is clear and free from all ambiguity, it must be given effect as written.
When interpreting a law (ordinance), the court should give it the meaning the lawmaker intended. It is presumed that every word, sentence or provision in the law was intended to serve some useful purpose, that some effect is to be given to each such provision, and that no unnecessary words or provisions were used. Conversely, it will not be presumed that the lawmaker inserted idle, meaningless or superfluous language in the law or that it intended for any part or provision of the law to be meaningless, redundant or useless. The lawmaker is presumed to have enacted each law with deliberation and with full knowledge of all existing laws on the same subject. The meaning and intent of a law is to be determined by a consideration of the law in its entirety and all other laws on the same subject matter, and a construction should be placed on the provision in question which is consistent with the express terms of the law and with the obvious intent of the lawmaker in enacting it. Where it is possible to do so, it is the duty of the courts in the interpretation of laws to adopt a construction of the provision in question which harmonizes and reconciles it with other provisions. A construction of a law which creates an inconsistency should be avoided when a reasonable interpretation can be adopted which will not do violence to the plain words of the law and will carry out the intention of the lawmaker.
When the expressions of a law are "dubious", the most effectual way of discovering the true meaning of the law is to consider the reason and spirit of it, or the cause which induced the lawmaker to enact it. When a law is susceptible to two or more interpretations, that which affords a reasonable and practical effect to the entire act is to be preferred over one which renders part thereof ridiculous or nugatory. If there is an irreconcilable conflict between the provisions of a law, only one provision can prevail.
(Citations omitted).
In Nunez v. Wainoco Oil & Gas Company, 488 So.2d 955, 959-964 (La.1986), the Louisiana Supreme Court discussed the interaction of the concept of ownership in the Civil Code with the provisions of the Mineral, Oil and Gas Conservation Law and the Mineral Code as follows:
"Oil is found in reservoirs which generally are bodies of porous and permeable rock in which oil has accumulated in sufficient quantity to permit its commercial recovery. In order for this underground accumulation to permit profitable production, there must be a high enough concentration of oil to permit movement and there must be a source of energy available to move the oil from the reservoir into the well. Although this reservoir energy may be of several types, the chief expulsive force is gas. Production occurs once the reservoir is punctured by drilling operations and the pressure gradients combine to move the oil toward the point of lower pressure and to lift it through the opening to the surface. Since gas and water tend to move toward the area of reduced pressure more rapidly than does oil, these sources of reservoir energy may by-pass the oil, making their way to the well alone and leaving behind a part of the oil, if production is not controlled. It is necessary to employ a reasoned and proportionate use of the reservoir energy if production is to bring to the surface the greatest percentage of recoverable oil. H. Daggett, supra at 414-17.
"In the early days of the oil industry, these physical factors were poorly understood. It was thought that oil flowed in underground rivers and an analogy was seen between the ownership of oil and the ownership of water and animals which traverse one's property. Thus the `rule of capture' was adopted (and has been sustained within certain limitations even after *391 the nature of reservoirs was better understood.) It has been defined as
a rule of law (sometimes called rule of convenience) arising from ownership of property, or the right to produce oil and gas, by virtue of which an operator who drills on his own land, or land held under an oil and gas lease or other instrument, acquires title to the oil which he legally produces from the well, whether or not drainage takes place from surrounding properties. H. Daggett, supra 419-21.
Needless to say, the period of oil and gas development that followed the adoption of such a rule was characterized by haste, inefficient operations, and immeasurable waste within the ground and above. In Lilly v. Conservation Commissioner of Louisiana, 29 F.Supp. 892, 897 (E.D.La. 1939), it was suggested that
without the power to regulate or control conditions in an oil field, the temptation to acquire quick riches might easily produce an intolerable situation in drilling indiscriminately upon any size or shape of tract, sufficient to permit derrick operations, resulting in waste and exhaustion of underground energy consisting of natural gas, etc. and ultimately restricting recovery, involving useless expenditures by operators and preventing some, if not all, from recovering their investments.
Thus, this federal district court judge reasoned that
[s]uch a condition, it would seem, should be subject to the police power of the State, not only to prevent waste, but to insure a fair and reasonable participation, by the surface owners in the common pool within the producing area.
. . . . .
Rather than amend the conservation measures piecemeal, the Legislature determined that a complete revision of existing legislation was needed. The result was 1940 La.Acts No. 157, which embodied the best features of the New Mexico law as well as the then recently enacted Arkansas law. Based on almost 50 years of legislative experience and judicial interpretations, this conservation statute was considered one of the best in the country. L. Moses, Louisiana's Oil and Gas Conservation Law, 24 Tul.L.Rev. 311 (1950). This act, as amended, constitutes Louisiana's basic conservation law with respect to the oil and gas industry.
"At the time of the act, the Department of Conservation, directed and controlled by the Commissioner of Conservation, had already been established by La. Const. of 1921, art. VI, § 1(C). When the 1974 Constitution deleted Article VI, § 1(C) of the 1921 Constitution, La.Rev.Stat.Ann. § 30:1 A was amended to establish the Department under the direction of a Commissioner who was to be appointed by the governor for a four year term, with the consent of the Senate.
"The Commissioner has the general power and `authority over all persons and property necessary to enforce effectively the provisions of this Chapter and all other laws relating to the conservation of oil and gas.' He has specific investigative powers to determine whether or not `waste' exists or is imminent and the general authority to establish whatever rules, regulations, and orders are necessary to prevent it and to enforce the conservation laws. In recognition of the physical factors involved in the production of hydrocarbons, the Commissioner is also given the specific power to establish a drilling unit or units for each pool. Although the owners of separate tracts may `agree to pool their interest and to develop their lands as a drilling unit,' the Commissioner is authorized to `require' unwilling owners to pool their interests if he finds it necessary to prevent waste or to avoid drilling unnecessary wells. This power of forced integration has been described as `[a] necessary weapon in the enforcement of drilling patterns.'
"The effects of forced pooling have been described in Mire v. Hawkins, 249 La. 278, 186 So.2d 591, 596 (1966). Forced pooling or compulsory unitization was found to convert separate interests within the drilling unit into a common interest with regard to the development of the unit and the drilling of the well. The Mire court, asked to *392 consider whether the designation of nondrilling areas within drilling units created by the Department constituted an obstacle to the use of a mineral servitude on lands within the nondrilling areas, recognized that the effects of unit operations were `a departure from the traditional notions of servitude contemplated by the Civil Code' although they were validly imposed by law for a public purpose.
"In fact, the concept of unitization, embodying the principle of ownership in minerals produced from a common source of supply, co-extensive with the individual ownership of the overlying land, is a departure from the traditional notions of private property. Ownership, defined in La.Civ.Code Ann. art. 477 as `the right that confers on a person direct, immediate, and exclusive authority over a thing,' suggests dominion and does not contemplate that others have rights to the object of ownership. According to La.Civ.Code Ann. art. 490, such exclusive authority, applies to the subsurface directly beneath a property owner's tract.
"We note, however, that each of these provisions has been modified in recent years to reflect a qualification of sorts in one's rights in private property. Whereas the predecessor to La.Civ.Code Ann. art. 477 granted to the owner use of property `in the most unlimited manner, provided it is not used in any way prohibited by law or ordinances,' currently an owner may use, enjoy, and dispose of a thing only `within the limits and under the conditions established by law,' which contemplates a broader range of exceptions to an owner's exclusive authority. And, La.Civ.Code Ann. art. 490's assertion that `the ownership of a tract of land carries with it the ownership of everything that is directly above or under it' was modified in 1979 to add the phrase `[u]nless otherwise provided by law.' Such a change no doubt did occur, at least in part, in recognition of the traits of subsurface minerals in liquid and gaseous form.
"Those traits prompted inclusion in the Mineral Code (Title 31) of § 6 which provides:
Ownership of land does not include ownership of oil, gas, and other minerals occurring naturally in liquid or gaseous form, or of any elements or compounds in solution, emulsion, or association with such minerals. The landowner has the exclusive right to explore and develop his property for the production of such minerals and to reduce them to possession and ownership. (emphasis added) 1974 La.Acts. No. 50, § 6.
Thus, it is clear that whatever the plaintiff may own under his tract, it does not include the liquid or gaseous minerals themselves. And, even the `exclusive right to explore' is qualified by the imposition of duties with regard to others who have rights in the common reservoir. La.Rev. Stat.Ann. § 31:9 and 10. As noted by a scholar on the subject, `[t]he principles of private ownership which involve dominion on the part of the landowner over all substances from the center of the earth to the heavens were inadequate to solve the problems of a substance under the earth, which would migrate to points of lower pressure caused by punctures of the reservoir by drilling.' H. Daggett, supra at 415.
"And what this plaintiff does own under his tract is `subject to reasonable statutory restrictions and the reasonable exercise of the police power.' According to La. Const. art. I § 4:
Every person has the right to acquire, own, control, use, enjoy, protect, and dispose of private property. This right is subject to reasonable statutory restrictions and the reasonable exercise of the police power.

Furthermore, this Court has already ruled that the Commissioner of Conservation's power to establish drilling units is a constitutional exercise of the State's police powers. Hunter Co., Inc. v. McHugh, 202 La. 97, 11 So.2d 495, 502-03 (1942) (quoting Ohio Oil Co. v. Indiana, 177 U.S. 190, 20 S.Ct. 576, 44 L.Ed. 729 (1900)). In Ohio Oil Co. v. Indiana, the United States Supreme Court viewed a similar statute as one actually `protecting private property and preventing it from being taken by one of the common owners *393 without regard to the enjoyment of the others.'
"Unitization is the device which the Louisiana Department of Conservation employs to protect the correlative rights of surface owners in a common reservoir, and, as discussed earlier, the device is clearly available without the consent of a particular landowner. La.Rev.Stat.Ann. § 30:10 A(1). In addition to the ability to establish drilling units for each pool, the Commissioner is authorized to designate a drilling site `at the optimum position in the drilling unit for the most efficient and economic drainage of such unit.' La.Rev.Stat. Ann. § 30:9 C. The Commissioner must also issue a permit before the well can be drilled, and `the issuance of the permit ... is sufficient authorization to the holder of the permit to enter upon the property covered by the permit and to drill in search of minerals thereon.' § 30:204 A and F. Although § 30:217 specifically requires the consent of the owner before any person conducts geological surveys for oil, gas, or other minerals, § 30:204 F, authorizing the permit holder to enter the property for drilling purposes, has no such requirement for consent.
"In fact, the high court of another oil producing jurisdiction has held that the operator of a pooled unit has a right to drill on a tract without the consent of the owner of the land on which the well was to be located. Texas Oil and Gas Corp. v. Rein, 534 P.2d 1277, 12798 (sic) (Okla.1975). The Oklahoma Supreme Court noted that
To hold otherwise would frustrate the intent of the Act because the owner desiring to drill would not be entitled to do so unless he held a lease covering the well location designated by the Commission.
"Like the Oklahoma Supreme Court, we conclude that the established principles of private ownership, already found inadequate in Louisiana to deal with the problems of subsurface fugacious minerals (see Daggett, supra at 415), need not necessarily be applied to other property concepts, like trespass, within a unit created by the Department of Conservation. Unitization which creates rights and interests in a pool of hydrocarbons beyond the traditional property lines, effectively amends La.Civ.Code art. 490 and other private property laws in the interest of conserving the natural resources of the state and, in effect, of protecting private property interests, or `correlative rights,' of nondrilling landowners. By prohibiting an individual landowner in the unit from drilling wells on their own tracts, by forcing them to share production, and by limiting the amount of hydrocarbons that can be produced, the exercise of the Commissioner's power to unitize necessarily results in infringement on the usual rights of ownership.

. . . . .
"Therefore, we hold that the more recent legislative enactments of Title 30 and Title 31 supercede in part La.Civ.Code Ann. art. 490's general concept of ownership of the subsurface by the surface owner of land. Thus, when the Commissioner of Conservation has declared that landowners share a common interest in a reservoir of natural resources beneath their adjacent tracts, such common interest does not permit one participant to rely on a concept of individual ownership to thwart the common right to the resource as well as the important state interest in developing its resources fully and efficiently." (Emphasis added; bolding added; footnotes omitted).
In Amoco Production Company v. Thompson, 516 So.2d 376, 388-389 (La. App. 1st Cir.1987), writs denied, 520 So.2d 118 (La.1988), this court had occasion to discuss the Commissioner's powers as follows:
The Commissioner has jurisdiction and authority over all persons and property necessary to enforce effectively the provisions of the Conservation Law and all other laws relating to the conservation of oil or gas. La.R.S. 30:4(A). The Commissioner has the authority to make any reasonable rule, regulation and/or order that is necessary to properly administer and enforce the Conservation Law. La.R.S. 30:4(C). Specifically, the *394 Commissioner has the power to make any rule, regulation and/or order necessary to (a) prevent wells from being drilled, operated or produced in a manner which causes injury to neighboring leases or property, (b) limit and prorate the production of oil or gas or both for the prevention of waste, and (c) regulate the spacing of wells and establish drilling units. La.R.S. 30:4(C)(3), (11) and (13). The Commissioner has the power to establish compulsory units and designate unit operators therefor. La.R.S. 30:9(B) and 30:10(A).
The primary duty of the Commissioner is to prevent waste of the state's mineral resources by exercising his authority to promote the full and efficient development of these resources. La.R.S. 30:2, 3 and 4. In the exercise of this duty, the Commissioner has the power to form compulsory drilling and production units "to prevent waste or to avoid drilling unnecessary wells." La.R.S. 30:10(A)(1). All orders forming compulsory units "shall be upon terms and conditions that are just and reasonable and that will afford the owner of each tract the opportunity to recover or receive his just and equitable share of the oil and gas in the pool without unnecessary expense." La.R.S. 30:10(A)(1)(a). The Commissioner may fix production allowables, but, in doing so, "shall prorate the allowable production ... so that each producer will have the opportunity to produce or receive his just and equitable share, subject to the reasonable necessities for prevention of waste." La.R.S. 30:11(B). An "equitable share" is defined in La.R.S. 30:9(D) as follows:
Subject to the reasonable necessities for the prevention of waste, and to reasonable adjustment because of structural position, a producer's just and equitable share of the oil and gas in the pool, also referred to as the tract's just and equitable share, is that part of the authorized production of the pool, whether it be the total which could be produced without any restriction on the amount of production, or whether it be an amount less than that which the pool could produce if no restriction on amount were imposed, which is substantially in the proportion that the quantity of recoverable oil and gas in the developed area of his tract or tracts in the pool bears to the recoverable oil and gas in the total developed area of the pool, in so far as these amounts can be practically ascertained. To that end, the rules, regulations, and orders of the commissioner shall be such as will prevent or minimize reasonably avoidable net drainage from each developed area, that is, drainage not equalized by counter drainage, and will give to each producer the opportunity to use his just and equitable share of the reservoir energy. In determining each producer's just and equitable share of the production authorized for the pool, the commissioner is authorized to give due consideration to the productivity of the well or wells located thereon, as determined by flow tests, bottom hole pressure tests, or any other practical method of testing wells and producing structures, and to consider other factors and geological and engineering tests and data as may be determined by the commissioner to be pertinent or relevant to ascertaining each producer's just and equitable share of the production and reservoir energy of the field or pool.
(Emphasis added; bolding added).
The following facts are controlling in this case. On July 3, 1984, Exxon issued a pre-application notice of its intent to apply to the Commissioner for the creation of a 320-acre drilling and production unit for Exxon 59. In factual finding 9 of Order No. 1239-A-1, the Commissioner observed as follows:
That upon receipt of a pre-application notice, the Commissioner of Conservation does not issue additional permits to drill to the same sand within the proposed unit. Thus, in order to protect the correlative rights of all parties affected by curtailment of their right of capture, and to prevent waste that would result from *395 the drilling of unnecessary wells, the Commissioner of Conservation grants only conditional allowables, requiring that all funds be escrowed from the date of the pre-application notice until an order issues creating the unit(s) and requiring that thereafter the escrowed funds be dispersed (sic) in accordance with the unit order.
On July 24, 1984, Exxon filed an application with the Commissioner which requested, among other things, that he "create an additional drilling and production unit ... and to force pool and integrate all of the separately owned tracts, mineral leases, and other interests within the proposed unit on a surface acreage basis." La.R.S. 30:9. This application invoked the jurisdiction of the Commissioner to, among other things, "make ... any reasonable ... orders that are necessary ... (3) to prevent wells from being ... operated, and produced in a manner to cause injury to neighboring leases or property...." La.R.S. 30:4(C). On August 22, 1984, Exxon applied to the Commissioner and requested retroactive clearance for "64,000 MCF of gas produced while testing the Exxon Fee 59 ... during the period August 1 through August 5" and requested "that this well be tested for assignment of a 20,000 MCF per day allowable effective [retroactive to] August 6". La.R.S. 30:7 and 30:11. By letter, dated September 21, 1984, the Commissioner advised Exxon it would be granted a daily gas allowable of 30,000 MCF retroactive to August 1, 1984, and effective through September 30, 1984, which allowable was "issued with the provision that all income be paid on the basis of the unit created ... retroactive to first date of production." The allowable was issued on September 28, 1984. Exxon produced gas on this basis until the date of unitization, October 23, 1984. It is the allocation of the production from August 1, 1984, until October 23, 1984, which must be decided in this case.
The issue herein is concisely set forth in S. Williams, Can a Louisiana Unit Order Be Effective Retroactively?, 49 La.L.Rev. 1119, 1132-1133 (1989) as follows:
The jurisprudence from ... [various] states illustrates the varying policies and interests that must be considered in determining whether a unit order is effective retroactively. The states addressing the question have come to different conclusions. The Texas Court of Appeal has determined that pooling orders may not be retroactive at all. Oklahoma has concluded that the United States Constitution requires that pooling orders be retroactive. Nebraska has concluded that pooling orders may be retroactive to the date of first production, but only when that is equitable. The question remaining for discussion is whether Louisiana may or must make unit orders effective retroactively.
As further analysis will show, the adjacent landowner may claim that retroactivity is compelled to avoid the unconstitutional taking of his property. On the other hand, the producing landowner could just as easily argue that the taking of production which he has already reduced to possession is a taking in itself. Before analyzing these claims of both landowners, it is important to recall basic Louisiana mineral concepts.
Prior to the creation of a unit, a producing landowner is free to produce oil and gas that migrates from beneath the property of his neighbor without sharing the production with his neighbor. Upon an application for unitization, the Commissioner routinely denies adjacent landowners the right to drill offset wells for the purpose of preventing waste and to avoid the drilling of unnecessary wells. During the period of time between the filing of the application and the issuance of the order, however, the producing landowner is free to drain oil and gas from beneath his neighbor without his neighbor being able to prevent drainage. It is the production during this interim period that adjacent landowners feel entitled to share, but that producers believe cannot be taken from them.

(Emphasis added; footnotes omitted).
As indicated in Nunez and Amoco, the Commissioner has been given broad *396 authority to exercise the police power of the State concerning matters under his jurisdiction. Exxon contends that the Commissioner's order, granting an allowable conditioned upon Exxon's acceptance of a pay out of proceeds from production from Exxon 59 in compliance with the unit to be created, is a taking of its property without due process, a denial of equal protection of the law and, therefore, constitutionally infirm.[2] We disagree.
Prior to the date of a pre-application notice the rule of capture prevails, and Exxon is entitled to all production. After a pre-application notice (when the adjoining landowner is thus deprived of his right to explore), the Commissioner has the authority to condition an allowable on compliance with a unit yet to be created. The owner-operator (Exxon) has a choice of shutting the well in until a unit is created or accepting the conditional allowable. The Commissioner's exercise of this power, as long as it is not arbitrary or capricious, modifies the rule of capture and limits the traditional notions of ownership. If the action of an owner (1) causes waste [La.R.S. 30:2], (2) precludes another owner from recovering or receiving his just and equitable share [La.R.S. 30:10(A)(1)(a) ], or (3) infringes on the correlative rights of another owner by limiting his liberty to enjoy his rights or causes damages to him [La.R.S. 31:9, 31:10 and 31:11], the Commissioner has the authority to take appropriate action.
Therefore, under the circumstances presented herein, we conclude that the Commissioner had the authority to order a conditional allowable for production of Exxon 59 from August 1, 1984, to October 23, 1984 (the pre-application notice having been filed by Exxon on July 3, 1984).
After reviewing the law and the particular facts of this case and after balancing the respective interests of the parties and the State, we conclude that the Commissioner had legal authority to issue Order No. 1239-A-1 and that the order was a reasonable exercise of that authority. Cf. C.H. Kuykendall v. Helmerich & Payne, Inc., 741 P.2d 869 (Okla.1987); Farmers Irrigation District v. Schumacher, 187 Neb. 825, 194 N.W.2d 788 (1972).

DECREE
For the foregoing reasons, the judgment of the trial court is affirmed. Exxon is cast for all costs on appeal.
AFFIRMED.
APPENDIX I
STATE OF LOUISIANA
OFFICE OF CONSERVATION
BATON ROUGE, LOUISIANA
 March 4, 1986
ORDER NO. 1239-A-1
Order concerning the manner of distributing revenues or allocating production from the Exxon-Fee No. 59 Well, in the M36A-4 Sand, Reservoir A, in the North Pecan Island Field, Vermilion Parish, Louisiana, for the time period from the date that a pre-application notice was filed, same being July 3, 1984, to October 23, 1984, the stipulated effective date of the unit created by Order No. 1239-A.
* * * * * *
Pursuant to power delegated under the laws of the State of Louisiana, and particularly Title 30 of Louisiana Revised Statutes of 1950, and after a public hearing held under Docket 86-41 in Baton Rouge, Louisiana, on January 21, 1986, following legal publication of notice and notice in accordance with rules prescribed by the Commissioner of Conservation, the following Supplement To Order No. 1239-A is issued and *397 promulgated by the Commissioner of Conservation as being reasonably necessary to conserve the natural resources of the State, to prevent waste as defined by law, to allow each party the opportunity to receive his just and equitable share of the revenues from the gas and condensate produced from the pool defined as the M36A-4 Sand, Reservoir A, North Pecan Island Field, Vermilion Parish, Louisiana, and otherwise to carry out the provisions of the laws of this State and of Order No. 1239-A.

FINDINGS
The Commissioner of Conservation finds as follows:
1. That Exxon Corporation drilled and completed the Marion J. Epley No. 1 Well.
2. That pursuant to application by Exxon, after proper notice and hearing, the Commissioner of Conservation issued Order No. 1239, effective September 27, 1983, creating three (3), three hundred twenty (320) acre drilling and production units for the M36A-4 Sand, Reservoir A, in the North Pecan Island Field, Vermilion Parish, Louisiana. The Marion J. Epley No. 1 Well was designated the unit well for the M36A-4 Sand Reservoir A, Sand Unit A.
3. That subsequent to the promulgation of Order No. 1239, Exxon obtained a permit to drill the Exxon Fee No. 59 Well at a legal location, in full compliance with Statewide Order 29-E and other relevant rules and regulations of the Office of Conservation.
4. That the Exxon Fee No. 59 Well was drilled and completed by Exxon as a producer in the M36A-4 Sand, Reservoir A.
5. That on July 3, 1984, Exxon notified all interested parties by mail of Exxon's intent to apply to the Commissioner of Conservation for a public hearing to consider evidence to create a three hundred and twenty (320) acre drilling and production unit for the M36A-4 Sand, Reservoir A for the Exxon Fee No. 59 Well, which unit proposal was consistent with the pattern of the geographical units created by Order No. 1239. This unit proposal was assigned Docket No. 84-638.
6. That on August 22, 1984, Exxon wrote to the District Manager of the Office of Conservation, Lafayette, Louisiana, requesting clearance for gas produced while testing the Exxon Fee No. 59 Well during August 1-5, 1984, and requesting that the well be tested for an assignment of a gas allowable effective August 6, 1984.
7. That on September 28, 1984, the Lafayette District Manager of the Office of Conservation issued an allowable for the Exxon Fee No. 59 Well, conditioned on the provision that all income be paid on the basis of the unit created either by Docket No. 84-638 or by Docket No. 84-684, retroactive to the first date of production.
8. That no lease allowable had been issued previous to July 3, 1984, the date Exxon's pre-application notice was filed as set forth in Finding No. 5 above. The conditional allowable issued on September 28, 1984, as shown in Finding No. 7 above, was therefore made retroactive to date of first production rather than conditioning same on the escrowing of funds from the date of the pre-application notice, which would have been the case had the Exxon Fee No. 59 Well been previously produced on a lease allowable.
9. That upon receipt of a pre-application notice, the Commissioner of Conservation does not issue additional permits to drill to the same sand within the proposed unit. Thus, in order to protect the correlative rights of all parties affected by curtailment of their right of capture, and to prevent waste that would result from the drilling of unnecessary wells, the Commissioner of Conservation grants only conditional allowables, requiring that all funds be escrowed from the date of the pre-application notice until an order issues creating the unit(s) and requiring that thereafter the escrowed funds be dispersed in accordance with the unit order.
10. That Office of Conservation Order No. 1239-A was issued, adopting the unit proposal submitted by the applicant under *398 Docket No. 84-684, dissolving the units created by Order No. 1239 and simultaneously creating a revised drilling and production unit for the M36A-4 Sand, Reservoir A, designating the Marion J. Epley No. 1 Well as the unit well and the Exxon Fee No. 59 Well as the alternate unit well.
11. That Order No. 1239-A further provided, pursuant to the agreement of the represented parties and the Commissioner of Conservation, that the issue of the conditional allowable granted for the Exxon Fee No. 59 Well for the time period of the date of first production to October 23, 1984, would be determined by another public hearing relating solely to this issue.
12. That this hearing was held under Docket NO. 86-41, upon the call of the Commissioner of Conservation, following legal publication of notice, on January 21, 1986.

ORDER
NOW, THEREFORE, IT IS ORDERED THAT:
1. In discharging its statutory obligations to prevent waste and to protect the correlative rights of all parties affected by the exercise of its delegated authority, the Office of Conservation acted in accordance with law by issuing a conditional allowable for production of the Exxon Fee No. 59 from the date of the pre-application notice filed by Exxon Corporation.
2. In this instance, where the represented parties have agreed that the issue of participation in production from the Exxon Fee No. 59 Well involved participation from the date of first production to the effective date of Order No. 1239-A, and the Exxon Fee No. 59 Well having not been previously granted a lease allowable, all production from said Well from the date of first production, same being August 1, 1984, to October 23, 1984, the agreed upon effective date for Order No. 1239-A, shall be allocated on the basis of the unit created by said Order.
This Order shall be effective on and after February 27, 1986.
 OFFICE OF CONSERVATION
 OF THE STATE OF LOUISIANA
 /s/ Herbert W. Thompson
NOTES
[1] For specific factual findings and order language, see Order No. 1239-A-1, which is attached as Appendix I.
[2] Pierce v. Goldking Properties, Inc., 396 So.2d 528 (La.App. 3rd Cir.1981), writ denied, 400 So.2d 904 (La.1981) is clearly distinguishable from the instant case. In Pierce, the lessor sued the lessee for failing to protect his property from drainage by a well on adjacent property. The Commissioner had not issued a conditional allowable, and the lessee acted as a reasonably prudent operator and with all due diligence in its efforts to protect the leased premises. The lessee operator did not have the choice of producing or not producing, and the legality of a conditional allowable was not at issue.