# STATE OF LOUISIANA
# COURT OF APPEAL, THIRD CIRCUIT

## 08-1210


DENBURY ONSHORE, L.L.C.

VERSUS

JEAN FONTENOT PUCHEU, ET AL.


************

APPEAL FROM THE
THIRTY-FIRST JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON DAVIS, NO. C-205-04
HONORABLE ANNE LENNAN SIMON, DISTRICT JUDGE *PRO TEMPORE*

************

## MICHAEL G. SULLIVAN
## JUDGE

************

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Jimmie C. Peters, and Michael G. Sullivan, Judges.


**REVERSED.**

M. Terrance Hoychick
Attorney at Law
Post Office Drawer 391
Eunice, Louisiana  70535-0391
(337) 457-9331
Counsel for Defendants/Appellants:
    Jean Fontenot Pucheu
    Germaine Fontenot Rhodes
    Fontenot-Pucheu, L.L.C.

Joseph C. Giglio, Jr.
Liskow & Lewis
Post Office Box 52008
Lafayette, Louisiana  70505-2008
(337) 232-7424
Counsel for Plaintiffs/Appellees:
    Denbury Onshore, L.L.C.
    Suncoast Land Services, Inc.

**A. J. Gray, III**
**Bart R. Yakupzack**
**The Gray Law Firm**
**Post Office Box 1467**
**Lake Charles, Louisiana  70602-1467**
**(337) 494-0694**
**Counsel for Defendants/Appellees:**
      **Loris M. Davidson**
      **Max D. Davidson, Inc.**
      **Janzen Family Trust**
      **Robert C. Henderson**
      **Stacey R. Henderson**
      **Shirley Ann Henderson Van Dyke**
      **Stephen Fred Gordon**
      **Thomas C. Ross, III**
      **Janet Ross Marberry**
      **Diana Ross Steinmetz**
      **Craig Lee Davidson**
      **Mark D. Davidson**
      **Stacey R. Henderson, Jr.**
      **Courtney Lawrence Russell**
      **Shirley Gilbert Henderson**
      **Robin C. Henderson**
      **Kelly Henderson Nelson**
      **Dana Henderson Norton**

**SULLIVAN, Judge.**

This concursus proceeding concerns the disbursement of oil and gas royalties attributable to production from a well situated in Jefferson Davis Parish, which occurred prior to a unit being established by the Office of Conservation. Lessors of the property on which the well is situated appeal the trial court's grants of summary judgment in favor of their lessee and their adjoining landowners and its denial of their motion for summary judgment. For the following reasons, we reverse.

### *Facts and Procedural History*

In July 2003, Jean F. Pucheu and Germaine F. Rhodes (the Pucheus)[1] granted an oil, gas, and mineral lease in favor SunCoast Land Services, Inc. (SunCoast). Their adjoining neighbors to the north, Loris M. Davidson, Max D. Davidson, Inc., Janzen Family Trust, Robert C. Henderson, Stacey R. Henderson, Shirley Ann Henderson Van Dyke, Stephen Fred Gordon, Thomas C. Ross, III, Janet Ross Marberry, Diana Ross Steinmetz, Craig Lee Davidson, Mark D. Davidson, Stacey R. Henderson, Jr., Courtney Lawrence Russell, Shirley Gilbert Henderson, Robin C. Henderson, Kelly Henderson Nelson, and Dana Henderson Norton (the Davidsons), also executed an oil, gas, and mineral lease in favor of SunCoast. SunCoast assigned the leases to Denbury Onshore, L.L.C. (Denbury).

On October 12, 2003, Denbury spudded a well, the "Amanda Fontenot et al No. 1 Well" (the well), on the Pucheus' property. In November, Denbury requested that the Pucheus execute an escrow agreement, which authorized it to escrow royalties that would accrue prior to unitization of the well and disburse the royalties in accordance with the unit order that would be issued by the Office of Conservation.

---

[1]Thereafter, the Fontenot-Pucheu, L.L.C. was formed by Jean F. Pucheu and her children. Hereinafter, reference to the Pucheus includes the Fontenot-Pucheu, L.L.C.

John and Jacque Pucheu are the sons of Jean F. Pucheu and shareholders in Fontenot-Pucheu, L.L.C. They are both attorneys and represented the Pucheus in the matters preceding this litigation. John McDaniel, a landman with Denbury, dealt with John and Jacque to get the escrow agreement executed. After John and Jacque discussed the escrow agreement with Mr. McDaniel and with SunCoast's landman, Jerry Thomas, the Pucheus executed the escrow agreement on December 5, 2003. The well was successfully completed on December 23, 2003. Denbury obtained permission from the Commissioner of Conservation to produce the well on a lease basis, and the well began producing gas and condensate for sale on December 31, 2003.

On January 14, 2004, Denbury filed a pre-application notice with the Commissioner of Conservation, advising of its intent to establish a unit for the Bol Perca Zone, Reservoir P, in the South Thornwell Field. The following day, a geologist hired by the Davidsons to monitor the drilling of the well and to protect their interests confirmed with Denbury that it had obtained an escrow agreement from the Pucheus. On February 6, 2004, Denbury filed an application with the Office of Conservation to establish the unit identified in its January 14, 2004 notice. On March 8, 2004, the Pucheus notified Denbury that, effective January 1, 2004, they revoked and canceled the escrow agreement and demanded immediate payment of all royalties attributable to pre-unitization production, together with penalties, interest, and attorney fees. The Office of Conservation issued Order No. 479-C-36, establishing the unit as requested on April 19, 2004. The Order provided that the unit was effective March 16, 2004.

Faced with possible claims by the Pucheus and the Davidsons for penalties, interest, and attorney fees for failing to timely and properly pay royalties, Denbury filed this concursus proceeding on April 7, 2004. It named the Pucheus and the Davidsons as defendants and deposited all disputed royalties into the registry of the court to allow the trial court to determine ownership of the deposited funds. Denbury asserted that it "had planned to distribute royalty proceeds in accordance with the [escrow] agreement believing both that it was authorized to do so by the Pucheus and that such treatment was fair to both sets of its lessors." Moreover, Denbury asserted that because of its escrow agreement with the Pucheus, it did not attempt to determine the precise distance between the bottom hole and the Davidsons' property until after receipt of the Pucheus' notice of revocation of the escrow agreement.

The Pucheus filed a reconventional demand, naming Denbury as defendant and SunCoast as third-party defendant. They claimed Denbury committed fraud and/or breached their lease because it did not notify them that the escrow agreement was not needed to obtain the production allowable and that Denbury made misrepresentations to them concerning the need for the escrow agreement. They asked for dissolution of the lease and/or 100% of the pre-unitization royalties, or, alternatively, statutory penalties under La.R.S. 31:139 and any other applicable law; attorney fees as provided in La.R.S. 31:139 and/or La.Civ.Code art. 1958; and if the escrow letter was found to be a valid contract, "damages arising from the loss of the disputed funds and for the inconvenience of having to litigate this matter."

Thereafter, all parties filed motions for summary judgment. Denbury and SunCoast filed a motion for summary judgment, seeking dismissal of the Pucheus' claims; the Pucheus filed a motion for partial summary judgment in which they seek

3

a judgment declaring them to be the owners of all royalties attributable to production from the well for the period of December 31, 2003, and March 16, 2004; and the Davidsons filed a cross motion for summary judgment, seeking a judgment denying the Pucheus the right to revoke the escrow agreement on the basis that they detrimentally relied on the Pucheus' execution of the escrow agreement and did not take action to protect their interests. They also seek 40% of the pre-unitization production.

After a hearing, the trial court granted summary judgment in favor of Denbury and the Davidsons; it denied the Pucheus' motion for partial summary judgment. After the trial court issued its Reasons for Decision, but before a judgment in conformity with those Reasons was signed, Denbury filed two more motions for summary judgment pertaining to disbursement of the funds deposited in the concursus.

### *Assignments of Error*

The Pucheus assign as error the trial court's grant of summary judgment in favor of Denbury, dismissing their claims for breach of lease, rescission of the escrow agreement, damages, and penalties and attorney fees for failure to timely pay royalties. They also assign as error the trial court's reliance on principles of equity to grant summary judgment in favor of the Davidsons and its refusal to strike Mr. McDaniel's affidavit that was filed in connection with Denbury's third motion for summary judgment.

### *Motion for Summary Judgment*

A motion for summary judgment will be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,

4

show that there is no genuine issue as to material fact, and that mover is entitled to judgment as a matter of law." La.Code Civ.P. art. 966(B). Summary judgment is favored and shall be construed "to secure the just, speedy, and inexpensive determination of every action." La.Code Civ.P. art. 966(A)(2).

The mover bears the initial burden of proof to show that no genuine issue of material fact exists. La.Code Civ.P. art. 966(C)(2). However, if the mover will not bear the burden of proof at trial, he need not negate all essential elements of the adverse party's claim, but he must point out that there is an absence of factual support for one or more elements essential to the claim. *Id.* Once the mover has met his initial burden of proof, the burden shifts to the nonmoving party to produce factual support sufficient to establish that he will be able to satisfy his evidentiary burden at trial. *Id.*

Appellate courts review motions for summary judgments de novo, asking the same questions the trial court asks to determine whether summary judgment is appropriate. *Champagne v. Ward*, 03-3211 (La. 1/19/05), 893 So.2d 773. This inquiry seeks to determine whether any genuine issue of material fact exists and whether the mover is entitled to judgment as a matter of law. La.Code Civ.P. art. 966(B).

> A fact is material if it potentially insures or precludes recovery, affects a litigant's ultimate success, or determines the outcome of the legal dispute. A genuine issue is one as to which reasonable persons could disagree; if reasonable persons could reach only one conclusion, there is no need for trial on that issue and summary judgment is appropriate.

*Hines v. Garrett*, 04-806, p. 1 (La. 6/25/04), 876 So.2d 764, 765-66 (citation omitted).

If issues regarding subjective facts are present, such as intent, knowledge, motive, malice, or good faith, a summary judgment determination is usually not

appropriate. *Murphy's Lease & Welding Serv., Inc. v. Bayou Concessions Salvage, Inc.*, 00-978, 00-979 (La.App. 3 Cir. 3/8/01), 780 So.2d 1284, *writ denied*, 01-1005 (La. 6/1/01), 793 So.2d 195. Credibility determinations are also inappropriate in a summary judgment procedure. *Hines*, 876 So.2d 764. "[T]he trier of fact who has the opportunity to hear all the evidence and to observe the witnesses" should make such determinations. *Belgard v. Am. Freightways, Inc.*, 99-1067, p. 5 (La.App. 3 Cir. 12/29/99), 755 So.2d 982, 986, *writ denied*, 00-293 (La. 3/31/00), 756 So.2d 1147.

### *Discussion*

At the heart of this litigation is the "rule of capture," which provides that a landowner does not own the minerals beneath his property but has the right to reduce those minerals to his possession and ownership, La.R.S. 31:6, "even though his operations may cause their migration from beneath the land of another." La.R.S. 31:8; *see also Pierce v. Goldking Props., Inc.*, 396 So.2d 528 (La.App. 3 Cir.), *writ denied*, 400 So.2d 904 (La.1981). The Davidsons' property adjoins the Pucheus' property; therefore, migration or drainage of minerals from their property by the well is an issue for them. The rule of capture has been modified by rules adopted by the Commissioner of Conservation, who has broad authority to exercise police power to protect our natural minerals and to protect landowners' interests. *Exxon Corp. v. Thompson*, 564 So.2d 387 (La.App. 1 Cir.), *writ denied*, 568 So.2d 1054 (La.1990).

As lessee, Denbury was obligated to act "in good faith and to develop and operate the property leased as a reasonably prudent operator for the mutual benefit to himself and his lessor." La.R.S. 31:122. Its obligations to the Davidsons included "endeavoring to prevent substantial drainage of the leased premises." *Breaux v. Pan Am. Petroleum Corp.*, 163 So.2d 406, 415 (La.App. 3 Cir.), *writ denied*, 246 La. 581,

6

165 So.2d 481 (1964). Therefore, Denbury was faced with the competing interests of the Pucheus and the Davidsons. If it failed to protect the interests of either lessor, that lessor has a remedy against it for damages. *Eagle Lake Estates, L.L.C. v. Cabot Oil & Gas Corp.*, 330 F.Supp.2d 778 (E.D.La. 2004).

The escrow agreement Denbury had the Pucheus execute provides in pertinent part:

> Once drilled, the well may be at an exceptional location with respect to the adjoining landowners and under Statewide Order No. 29-E and present policy of the Office of Conservation, Denbury would be unable to produce this well on a lease basis. In addition, in the event that this well is successfully completed as a producer, it will be necessary to file unitization proceedings with the Office of Conservation requesting the establishment of an appropriate unit for this well. Once unitization proceedings are filed, the Office of Conservation will not allow Denbury to produce the subject well on a lease basis. The Office of Conservation will, however, grant Denbury a "conditional" allowable upon assurance by Denbury that revenues from all production from the subject well will be distributed in accordance with the unit order subsequently issued. The only prudent way that Denbury can make such a commitment . . . is if you agree that any revenues attributable to pre-unitization production accruing to your interest may be held in escrow pending the effective date of the unit created for the subject well, and thereafter, be paid in accordance with this letter agreement. By making use of this conditional allowable, shut-in time can be minimized and revenues attributable to your ultimate unit interest will be accumulating prior to issuance of the unit order.
>
> Accordingly, Denbury requests that you grant permission and approval to produce said well and escrow the funds attributable to production obtained from said well prior to the effective date of the order establishing a unit for said well, and to thereafter disburse the escrowed funds in accordance with said unit order.

Office of Conservation Statewide Order No. 29-E provides that a well cannot be drilled closer than 330 feet to a property line without protecting the adjoining landowner from drainage by the well. Such wells are known as "exceptional," as referenced in the escrow agreement. The Office of Conservation will not issue a permit for production of an exceptional well unless the operator has an escrow

agreement from the landowner on whose property the well is situated, which protects the interests of any adjoining landowners. Permits issued in these situations are known as "conditional allowables" because they are conditioned on disbursal of funds in accordance with a unit that has not yet been established. *Exxon*, 564 So.2d at 389.

As stated in the escrow agreement, Denbury thought the well "may" be an exceptional well when it was completed. This thought was based on a survey prepared for Denbury before it began drilling, which showed the well site was more than 353 feet from the Davidsons' property line, and on the fact that the well was being directionally drilled, which meant the bottom hole of the well ultimately could be less than 330 feet from the Davidsons' property line. Another survey was prepared when the well was completed; it indicated the well site and the bottom hole were more than 330 feet from the Davidsons' property line. Based on these surveys, Denbury submitted a request for and obtained an allowable on a "lease basis."

In April 2004, the Davidsons notified Denbury that the well was closer than 330 feet to their property. When Mr. Thomas, the landman for SunCoast who negotiated the leases with the Pucheus and the Davidsons, learned that the survey used to obtain the allowable from the Office of Conservation indicated the well was more than 330 feet from the Davidsons' property line, he also questioned the accuracy of the survey. Denbury had a new survey prepared that established the earlier survey was incorrect and the well and the bottom hole were less than 330 feet from the Davidsons' property.

According to the Pucheus, Denbury explained to them that if the well was less than 330 feet from the property line, a conditional allowable for production would have to be obtained and that an escrow agreement was required to obtain a

8

conditional allowable. They assert that they understood the escrow agreement would not be used if a conditional allowable was not required for production. Because Denbury obtained a lease basis allowable, which did not require the escrow agreement, the Pucheus claim the escrow agreement was no longer valid.

The Pucheus essentially argue: 1) they consented to the escrow agreement because it might be required to obtain an allowable to produce the well without shutting it in; 2) their consent was conditioned on the escrow agreement being required to obtain an allowable; 3) the escrow agreement was not required to obtain an allowable; therefore, their consent to it was no longer valid; 4) Denbury should have notified them that the escrow agreement was not required to obtain an allowable because the well was being produced on a lease basis, and its failure to do so amounted to a misrepresentation or fraud and/or breach of their lease; 5) they are entitled to all pre-unitization royalties because the escrow agreement was not necessary to obtain the allowable (or for the unitization proceeding); 6) the fact that the well was an exceptional well has no bearing on their claims; and 7) they are entitled to penalties and attorney fees because Denbury failed to pay timely some royalties due them.

Denbury argues: 1) the well was more than 330 feet from the Davidsons' property line; therefore, the basis for obtaining the escrow agreement always existed; 2) the Pucheus knew it intended to use the escrow agreement if needed to obtain a conditional allowable and/or in connection with the unitization proceeding; 3) the Pucheus' consent to the escrow agreement was not conditioned solely on it being used to obtain a conditional allowable because it always intended to unitize the well and the escrow agreement states so; 4) it did unitize the well; 5) it did not breach the

Pucheus' lease because it was not obligated to notify them that the well was being produced on a lease basis allowable and that the escrow agreement was not required to obtain an allowance to produce the well; 6) the Pucheus were not damaged because it would have filed the concursus proceeding as soon as they revoked their consent to the escrow agreement; and 7) it deposited royalties which exceeded the amounts due; therefore, the Pucheus are not entitled to penalties and attorney fees.

The Davidsons contend: 1) the well was less than 330 feet from their property line; therefore, the cause for the escrow agreement existed all along; and 2) it would be inequitable to allow the Pucheus to revoke their consent to the escrow agreement because they relied on the agreement to protect their interests.

### *Consideration of Evidence on Motions for Summary Judgment*

This is a factually-intensive case with competing interests, which is complicated by the fact that the well and bottom hole *were* less than 330 feet from the Davidsons' property line; however, this was not established until *after* the well was unitized. The Pucheus' primary complaint is that the trial court committed error in its consideration of the evidence that was submitted in support of and in opposition to the motions for summary judgment. They contend the trial court weighed and evaluated the evidence as to the merits of the claims presented and made credibility determinations, which are prohibited on summary judgment. Our review of the parties' claims in light of the applicable law and the evidence filed in support of and in opposition to those claims reveals several genuine issues of material fact which preclude summary judgment. We identify some, but not necessarily all, of those issues.

*Consent*

Under the rule of capture, the Pucheus are entitled to all royalties until some point in the unitization proceeding. The Pucheus claim that point is the effective date of the unit, March 16, 2004; Denbury claims it was earlier. Common sense dictates that the Pucheus would not relinquish royalties without good reason. They argue their consent was conditioned on the escrow agreement being required to obtain a conditional allowance and/or a unitization proceeding where a conditional allowance had been obtained. These claims are supported by John and Jacques Pucheus' affidavits.

Denbury asserts that it explained to John and Jacques Pucheu the escrow agreement would be used to obtain a conditional allowable and/*or* the unitization proceeding which it always intended to file. Mr. McDaniel and Mr. Thomas state this in their affidavits, but John and Jacques deny this in their affidavits. Accordingly, questions of fact exist as to what was explained to the Pucheus and what they intended when they consented to the escrow agreement; this cannot be resolved on summary judgment.

Consent to a contract can be vitiated by error. La.Civ.Code art. 1948. Parol evidence is admissible to prove whether consent to a contract was vitiated by error or mistake. La.Civ.Code art. 1848; *see also Myles v. Consol. Cos., Inc.*, 05-192 (La.App. 3 Cir. 6/1/05), 906 So.2d 677, *writ denied*, 05-2245 (La. 2/17/06), 924 So.2d 1019 (citing *Scafidi v. Johnson*, 420 So.2d 1113 (La.1982)).

Denbury also asserts the escrow agreement was required for the unitization proceeding, and Mr. McDaniel and Mr. Thomas state so in their affidavits. However, as the Pucheus point out, this requirement is not stated in Statewide Order 29-E, and

11

Denbury does not identify any Office of Conservation rule or regulation which contains this requirement. Moreover, there is no evidence that the escrow agreement was filed in connection with Denbury's notice of intent to unitize or in its application to unitize. Importantly, the Davidsons did not ask about the escrow agreement until *after* Denbury filed its notice of intent to unitize, and it is reasonable to assume they would have asked earlier if they believed they were entitled to royalties earlier. These facts establish that issues of fact remain as to whether the escrow agreement was required for the unitization proceeding because Denbury obtained a lease basis allowable to produce the well.

***Breach of Lease***

The Pucheus claim Denbury breached the terms of their lease because it did not give them notice when it filed for an allowable on a lease basis. The lease provision requires the lessee to give the lessor a copy of documents filed in: "any proceedings before any governmental authority relating to spacing, unitization, or other matters effecting [sic] drilling operations . . . or production." "Proceedings" is not defined, and the term is not self-explanatory.

Denbury asserts in pleadings and memoranda that the application process was not a "proceeding" under the pertinent lease provision which requires notice of a "proceeding"; however, no evidence was presented to establish these statements are correct. Accordingly, we find Denbury's assertions are insufficient for summary judgment.

***Fraud/Misrepresentations***

The Pucheus also claim Denbury made misrepresentations to them and/or committed fraud as to the need for the escrow agreement. They argue that the trial

court improperly determined Denbury's obtaining a lease basis allowable was an honest mistake. Denbury asserts the Pucheus cannot prove fraud because both the Pucheus' lease and the Davidsons' lease required payment of 1/5 royalty; therefore, it did not have the intent to obtain an unjust advantage for itself or to cause loss to the Pucheus.

Consent may also be vitiated by fraud. La.Civ.Code art. 1948. The trial court agreed with Denbury and concluded the Pucheus could not prove fraud and/or misrepresentation as defined in La.Civ.Code art. 1953 because they could not establish that Denbury made any misrepresentations "with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other." However, suppression of the truth is an element of fraud, and "[f]raud may . . . result from silence or inaction." La.Civ.Code art. 1953. Denbury not notifying the Pucheus that it obtained a lease basis allowable may not have created an unjust advantage for itself, but it did create an unjust advantage for the Davidsons, who were paid all pre-unitization royalties when they may not have been entitled to them. Whether it intended to cause a loss to the Pucheus is subjective and not appropriate for summary judgment. Accordingly, we find the trial court's dismissal of this claim was erroneous.

We also observe that Denbury, as lessee, was obligated to act in good faith with regard to the Pucheus' interests. If this obligation included the duty to notify them that it obtained a lease allowable, rather than a conditional allowable, it does not matter whether the mistake was honest or not; Denbury may be obligated to the Pucheus if they suffered damage as a result of its mistake. This has not been established; therefore, summary judgment cannot be granted on this issue.

13

*Damages*

The trial court granted summary judgment as to the Pucheus' claims, finding they could not prove damages. This finding was based on Denbury's argument that if they had notified the Pucheus the escrow agreement was not needed to obtain an allowable and the Pucheus revoked their consent at that time, it would have filed the concursus proceeding earlier and the Pucheus would not have any damages. However, filing a concursus proceeding does not address the issues identified above.

Furthermore, even if the escrow agreement was required for the unitization proceeding, genuine issues of material fact exist as to whether the Pucheus are entitled to royalties attributable to the Davidsons' property which accrued prior to the unitization proceeding being filed or prior to a particular stage of the proceeding. Under Denbury's arguments, at worst, the Pucheus are entitled to royalties that accrued before January 14, 2004, the date on which its notice of intent to unitize was filed, and at best, February 6, 2004, when it filed the unitization proceeding. In the absence of the escrow agreement, the Pucheus claim they are entitled to all pre-unitization royalties; this claim has not been negated by Denbury's arguments. Accordingly, genuine issues of material fact exist as to whether there would have been a period of time during which the Pucheus were entitled to all royalties if the escrow agreement was not applicable.

*Penalties and Attorney Fees*

In addition to the issues discussed above, the survey prepared in connection with the well also raised an issue of ownership regarding a strip of property between the Pucheus' and the Davidsons' properties. The Pucheus and Davidsons settled the issue by stipulating to the ownership of this strip, which is known as Tract 3. The

Pucheus claim Denbury failed to timely pay royalties attributable to Tract 3 and seek penalties and attorney fees as provided in La.R.S. 31:139.[2] Denbury argues that it overpaid royalties due the Davidsons by paying them directly and depositing equal amounts in the registry of the court; therefore, the royalties were, in fact, in the registry of the court, and the Pucheus' claim is without merit.

The Pucheus urge that the dates of the actual deposits determine the validity of their claim. A spreadsheet prepared by Mr. McDaniel summarizes royalties attributable to the well and lists amounts due by month; it does not itemize specific dates on which those amounts were due and/or deposited into the registry of the court. John Pucheu addressed Denbury's claims in an affidavit and a spreadsheet, which integrated information contained in Mr. McDaniel's spreadsheet, to support the Pucheus' claims that issues of fact remain as to whether royalties attributable to Tract 3 were paid timely. We have reviewed both affidavits and agree that Denbury has not established as fact that all royalties attributable to Tract 3 were timely paid to the Pucheus after demand, and summary judgment cannot be granted on this issue.

### The Davidsons' Cross Motion for Summary Judgment

In their cross motion for summary judgment, the Davidsons urge that the escrow agreement is a *stipulation pour autrui* in their favor and/or that the doctrines of detrimental reliance and equity are applicable, which prevent the Pucheus from

---

[2]Louisiana Revised Statutes 31:139 provides:

> If the lessee pays the royalties due in response to the required notice, the remedy of dissolution shall be unavailable unless it be found that the original failure to pay was fraudulent. The court may award as damages double the amount of royalties due, interest on that sum from the date due, and a reasonable attorney's fee, provided the original failure to pay royalties was either fraudulent or willful and without reasonable grounds. In all other cases, such as mere oversight or neglect, damages shall be limited to interest on the royalties computed from the date due, and a reasonable attorney's fee if such interest is not paid within thirty days of written demand therefor.

revoking their consent to the escrow agreement. We note that if the Pucheus' consent to the escrow agreement was vitiated by error or fraud, a contract was never formed, and these claims have no basis. *DePaul Hosp. v. Mut. Life Ins. Co. of New York*, 487 So.2d 143, (La.App. 4 Cir.), *writ denied*, 492 So.2d 1218 (La.1986).

However, even if the escrow agreement is ultimately determined to be valid, the Davidsons are not entitled to summary judgment against the Pucheus. Louisiana Civil Code Article 1978 provides, "[a] contracting party may stipulate a benefit for a third person called a third party beneficiary. Once the third party has manifested his intention to avail himself of the benefit, the parties may not dissolve the contract by mutual consent without the beneficiary's agreement." A *stipulation pour autrui* is never presumed, and the intent to benefit a third party must be clearly manifested in the contract. *Joseph v. Hosp. Serv. Dist. No. 2 of Parish of St. Mary*, 05-2364 (La. 10/15/06), 939 So.2d 1206. While Denbury claims the escrow agreement was obtained to protect the Davidsons' interests, the intent to benefit the Davidsons is not manifested in the escrow agreement itself. Furthermore, John and Jacques Pucheu specifically deny that they were informed by Mr. McDaniel or Mr. Thomas that Denbury intended to protect the Davidsons' interests with the escrow agreement. These opposing claims cannot be resolved on summary judgment.

Louisiana Civil Code Article 1967 provides in pertinent part, "[a] party may be obligated by a promise when he knew or should have known that the promise would induce the other party to rely on it to his detriment and the other party was reasonable in so relying." Article 1967 uses the term "party" and has been held to not apply to third parties. *Magic Moments Pizza, Inc. v. La. Rest. Ass'n,* 02-160 (La.App. 5 Cir. 5/29/02), 819 So.2d 1146; *Barrie v. V.P. Exterminators, Inc.*, 614 So.2d 295

(La.App. 4 Cir.), *rev'd on other grounds*, 625 So.2d 1007 (La.1993). The Davidsons are third parties to the escrow agreement. Accordingly, detrimental reliance is not applicable to their claims against the Pucheus.

The trial court also found merit in the Davidsons' claim that equity requires the Pucheus not be allowed to revoke their consent to the escrow agreement. The Davidsons rely on La.Civ.Code arts. 2054 and 2055 as support for this claim. Article 2054 provides in part, "[w]hen the parties made no provision for a particular situation . . . ." Pursuant to Article 2055, equity in Article 2054 "is based on the principles that no one is allowed to enrich himself unjustly at the expense of another." It is the basis for a claim of unjust enrichment. For a party to recover under the theory of unjust enrichment, he must prove an enrichment, an impoverishment, "a causal relationship between the enrichment and the impoverishment," "an absence of justification or cause for the enrichment or impoverishment," and the lack of any other remedy at law. *Fogleman v. Cajun Bag & Supply Co.*, 93-1177, pp. 4-5 (La.App. 3 Cir. 6/15/94), 638 So.2d 706, 709, *writ denied*, 94-1900 (La. 10/28/94), 644 So.2d 375 (quoting *Kirkpatrick v. Young*, 456 So.2d 622, 624 (La.1984). If a party has another legal remedy to prevent the loss he seeks to recover, unjust enrichment is not a proper ground for recovery. *Id.*

The Pucheus' claims are directed at Denbury's actions. If their claims are found to be valid, Denbury will likely be found to have breached its obligation to protect the Davidsons, as required by the terms of their lease, and the Davidsons will have a remedy against it. *Eagle Lake Estates, L.L.C.,* 330 F.Supp.2d 778. Accordingly, the Davidsons' claims of unjust enrichment are not appropriate for summary judgment.

17

***The Well's Actual Location***

Denbury and the Davidsons argue that the Pucheus' claims are unfounded and/or unfair because the well was actually less than 330 feet from the Davidsons' property line. This fact does not resolve the issues of fact which exist as to the Pucheus' claims but rather compounds them, resulting in additional issues of fact, which prohibit summary judgment.

***Admissibility of Affidavit***

The Pucheus' last assignment of error is that the trial court erred in admitting Mr. McDonald's affidavit which was filed as support for Denbury's third motion for summary judgment. They urge that the affidavit, which contains information compiled from various records prepared and maintained by other Denbury personnel, is inadmissible because it is not based on personal knowledge.

The requirement of personal knowledge in the context of affidavits was recently addressed in *Hibernia National Bank v. Rivera,* 07-962, pp. 8-9 (La.App. 5 Cir. 9/30/08), 996 So.2d 534, 539-40 (citations omitted). The court explained:

> Personal knowledge means something the witness actually saw or heard, as distinguished from what he learned from some other person or source. The purpose of the requirement of "personal knowledge" is to limit the affidavit to facts which the affiant saw, heard, or perceived with his own senses. Portions of affidavits not based on personal knowledge of the affiant should not be considered by the trial court in deciding a motion for summary judgment.

> Where business records are concerned, as in the present case, the courts have deemed La.C.C.P. art. 967 satisfied when the affiant is qualified to identify the business records as such. The affiant has not been required to show that he personally prepared the business records, or that he had direct, independent, first hand knowledge of the contents thereof.

Mr. McDaniel's affidavits do not establish that they are based on personal knowledge as required by La.Code Civ.P. art. 967. He does not identify the records

18

from which he prepared the spreadsheets attached to his affidavits or explain that he is personally familiar with the records and why. Accordingly, the affidavit is insufficient for summary judgment.

Denbury's reliance on La.Code Evid. art. 1006 as support for its claim that the affidavits satisfy the requirements of La.Code Civ.P. art. 967 is misplaced. Article 1006 provides that voluminous records can be summarized "in the form of a . . . calculation." It does not dispense with the requirement of personal knowledge.

### *Conclusion*

For the reasons discussed herein, the judgments of the trial court are reversed. Costs of this appeal are assessed to Denbury and the Davidsons.

**REVERSED.**

19