SUMMERS, Justice.
We granted certiorari herein (248 La. 367, 178 So.2d 657) to review the. judgment of the Court of Appeal, Third Circuit (177 So.2d 795), limiting the grant to a consideration of whether designation of non-drilling areas, within drilling units created by orders of the Department of Conservation, constitutes an obstacle to the user of a mineral servitude on lands within these non-drilling areas, thereby suspending the liberative prescription running against the mineral servitude.
The pertinent facts are as follows: Veon Mire and his wife Euchariste Savoy had six children. At their death they were survived by four of their children and a number of grandchildren, issue of a predeceased son and daughter named Lines 'and Lyna Mire. The plaintiffs in this suit, *283 Rita, Raymond and Joseph L. Mire, are three of the grandchildren and the surviving children of Lines Mire.
Among other things, the estate of Veon Mire and his wife consisted of approximately 152 acres of land in Acadia Parish. This land was inherited by the four surviving children and the grandchildren, including plaintiffs.
On November 27, 1946 the heirs partitioned the 152-acre tract. In the act of partition the three plaintiffs, together, were allotted Lot 1 containing approximately 25 acres— the remaining acreage being divided into lots numbered 2 to 6 and allotted to the other co-owners. In this partition, plaintiffs reserved an undivided l/6th interest in the minerals under the entire 152 acres. Later, on April 11, 1947, plaintiffs sold Lot 1 which they had received in the partition and reserved all minerals thereunder, which was, in effect, a reservation of l/6th of the minerals under this tract, as the other 5/6th mineral interest was vested in the other heirs.
Thus, at this time it should be observed plaintiffs were the owners of a l/6th mineral interest affecting Lots 2 through 6 on which the liberative prescription of ten years would accrue on November 27, 1956; and they were the owners of a l/6th mineral interest on Lot 1 on which the liberative prescription of ten years would accrue on April 11, 1957, in the absence of an interruption or suspension.
Then on October 15, 1953 plaintiffs, and all others having an interest in the lands and minerals underlying the 152-acre tract, granted mineral leases to the defendant Cecil Hawkins affecting their interest in the entire tract. In due course, these leases were assigned to defendants Continental Oil Co. and Texas Eastern Transmission Corporation as lessees.
Thereafter, the Department of Conservation, through its Commissioner, by its Order No. 307, effective May 1, 1955, established drilling and developmental units for the Nodosaria “A” Sand of the Rayne Field. One of these units included approximately 45.56 acres of the 152-acre Mire tract, consisting of portions of all six lots of the 1946 partition. This order provided that any well drilled on the units must be at least 1,320 feet from the nearest unit line. This latter proviso placed approximately 42.51 acres of the Mire tract affected by plaintiffs’ servitude within the area where drilling was. proscribed, leaving a net of about 3.05 acres of the Mire tract within the unit upon which drilling was permissible. No well was ever drilled on this unit.
The situation remained unchanged until the Commissioner issued Order No. 307-b, effective October 1, 1956 dissolving Order No. 307 and creating a new pattern of drilling and developmental units for the Nodosaria “A” Sand. One of these new units included 61.55 acres of the 152-acre Mire tract. These 61.55 acres were comprised *285 of portions of all six lots of the Mire tract. Under the terms of the new order any well drilled on this unit was required to be at least 1,000 feet from any unit line.
The new unit embraced part of, but not all of, the 45.56 acres of the Mire tract which had been included in the unit under the first order (No. 307), together with other portions of the 152-acre Mire tract. Portions of the Mire tract within this latter unit were within 1,000 feet of the unit boundary, but approximately 7.60 acres of the Mire lands were more than 1,000 feet from the unit boundaries. Thus, in this unit approximately 53.95 acres of 61.55 acres attributable to the Mire tract were within the area of the unit where drilling was proscribed, and 7.60 acres were within the area of the unit where drilling was permissible.
On April 10, 1957, more than ten years after the partition wherein plaintiffs reserved the minerals under Lots 2 through 6 of the partition, but within ten years from the reservation of the minerals under Lot No. 1, the defendant Continental Oil Co. began clearing a location for a well on the last unit'(307-b). This location was not on any portion of the Mire tract. Though not precise, the evidence indicates that on April 10, 1957 operations for clearing and preparing the well site were commenced, followed by the building of a board road and the digging of pits. The well was spudded in on April 24, 1957 and was completed as a gas producer from the Nodosaria “A” Sand in September 1957. The commercial production of gas from this well commenced on October 12, 1957, and has continued since that time.
Thus, it is clear that the mineral reservation in favor of plaintiffs, affecting Lots 2 through 6 of the Mire tract, is'prescribed as no drilling operation took place prior to November 27, 1956 or within ten years from November 27, 1946, the date of the creation of the servitude on those tracts, unless the orders of the Department of Conservation establishing nondrilling areas within the units created an obstacle which suspended the running of the ten-year prescription as to these lots.
Plaintiffs’ suit seeks to havé their servitude on Lot 1 recognized because of user by timely commencement of drilling operations, and to have the court recognize that an obstacle existed to the exercise'of their servitude on Lots 2 through 6 suspending prescription as to that servitude:
The trial court found- that as to Lot 1 a timely user took place as there was a good faith commencement of drilling operations prior to the ten-year period evidenced by preparing and clearing the well site on April 10, 1957, which operations ultimately resulted in production. The servitude on Lot 1 was therefore maintained in favor of plaintiffs.
The court also held that no obstacle in legal contemplation existed to the exercise *287 of the mineral servitude belonging to plaintiffs on-Lots 2 through 6. Therefore, as no drilling operations (user) took place on those lots the servitude thereon prescribed on November 27, 1956 — ten years after its creation by the reservation in the partition. The servitude on these lots, therefore, was lost to plaintiffs. The theory of this latter holding was that drilling operations could have been conducted at all times on that portion of the servitude tract within the unit outside the nondrilling area where drilling was permissible (either on the 3.05 acres in Unit 307 or the 7.60 acres in' Unit 307-b); and additionally, substantial portions of the servitude tract were located outside the unit upon which drilling operations could have been conducted, and the rights of the servitude owners could have been exercised in that manner.
No appeal was taken as to Lot 1. The decision as to Lots 2 through 6 was affirmed on appeal to the Court of Appeal, Third Circuit.
In their brief and argument before this court plaintiffs contend that, under the opinion in Boddie v. Drewett, 229 La. 1017, 87 So.2d 516 (1956), good faith drilling of a dry hole on any tract in the unit other than the servitude tract is not use of the servitude, and orders of the Commissioner restricting drilling to a certain area in the unit causes an obstacle to user of the servitudes in the nondrilling areas. Thus, it is argued, the order of .the Department of Conservation restricting drilling operations in this case created an obstacle to user of the servitude on Lots 2 through 6 such as is contemplated by Article 792 of the Civil Code, which provides:
“If the owner of the estate to whom the servitude is due, is prevented from using it by any obstacle which he can neither prevent nor remove, the prescription of non-usage does not run against him as long as this obstacle remains.”
The facts of Boddie v. Drewett indicate that it involved a twelve-acre tract owing a mineral servitude and the twelve-acre tract was included within the nondrilling area of a unit formed by the Department of Conservation. Prior to the expiration of ten years from the date of the creation of the mineral servitude, a well was drilled on the unit but not on the twelve acres. The well was dry. The district court held that drilling in good faith, even though the well was dry, was a user of mineral servitudes within the unit and, therefore, prescription was interrupted.
On appeal to this court the view was expressed that there could be no user of the servitude on the twelve-acre tract by drilling a dry hole in the unit, unless a well was drilled upon the land subj ect to the mineral servitude. It was considered, however, that user of the mineral servitude would take place when production was had with *289 in the unit, prior to the expiration of the ten-year period, even though the well were not on the tract owing the servitude. This opinion was based upon the theory that production within the unit was a user of all mineral servitudes within the unit because extraction of minerals from the unit was an extraction of minerals from every tract in the unit, and this extraction was a user of the servitude even though the well was not located on the servitude tract.
It was then declared that, as the twelve-acre tract was within the nondrilling area, prescription was suspended as to that tract under Article 792 of the Civil Code, as an obstacle existed to the exercise of the servitude thereon so long as the nondrilling order remained in effect or until production occurred within the unit.
The Boddie opinion was signed by three members of the court with four members concurring. After a further study of the opinion in that case we have concluded that it was error to say that prescription was suspended due to the existence of an obstacle. The reason is that this declaration, under the facts, is inconsistent with the objectives, aims and policies of our conservation law. We are of the view that the district judge was correct in holding that the drilling of a dry hole in a good faith effort to obtain production was a user of the mineral servitude on the twelve-acre tract within the nondrilling area of the unit; and, therefore, prescription on the servitude was interrupted.
In the instant case we predicate our opinion upon certain basic principles which we hold to be indisputable.
Article VI, Section 1, of the Louisiana Constitution ordains that the natural resources of the State shall be protected and conserved. It places oil, gas and other mineral resources under a Department of Conservation. R.S. 30:1 et seq., was enacted pursuant thereto. This legislation prohibits waste in connection with the production of oil and gas and defines the power and authority of the Commissioner. The Department of Conservation by this legislation is given the right to create drilling units and to force pool or integrate the privileges of owners of drilling rights therein in order to conserve oil and gas as natural resources and to prevent waste.
When a drilling unit is created and the separate interests therein are force pooled under the Conservation Statute, such as was done by Orders 307 and 307-b herein, the effect is to convert the various separate interests within the unit into a common interest so far as the development of the unit and the drilling of the well are concerned. As stated by Mr. John B. Hussey, former Commissioner of Conservation, Louisiana Department of Conservation, in a criticism of the Boddie case:
“The creation of units is not a complete bar to the drilling but merely speci *291 fies the manner in which the drilling must take place, that is, co-operation with others, and the co-operative effort in drilling the well in the manner contemplated by the conservation statute should be an exercise of the mineral servitude •of each owner of a drilling right * * * in the manner contemplated by the conservation statute, regardless of where the well is located in the unit and regardless of whether the well results in commercial production or a dry hole.” Institute on Mineral Law (5th Annual, 1957), p. 161, La. State University Press, edited by Daggett.
It may be asserted under this theory of the case that the pooling of the mineral servitude belonging to plaintiffs with the designation of an operator for the unit having the right and authority to conduct drilling operations on behalf of all mineral owners within the unit was, in effect, permitting the exercise of the drilling privilege relating to plaintiffs’ servitude through a representative, and on lands, designated by law. This is so because the exploration effort of the operator is considered as an effort on behalf of all the interests in the unit; if this effort is successful, the resulting production, to which all tracts contribute, will be distributed to all interests in the proportion which their acreage in the unit bears to the entire acreage. Good faith drilling on any part of the unit should likewise be considered as good faith drilling as to the whole unit and a user of all the servitudes within the unit.
The requirement that the drilling for minerals within a unit be through a designated operator on a designated location, or by a joint cooperative effort on a designated location, may be a departure from the traditional notions of servitude user contemplated by the Civil Code, but the requirement is validly imposed by law in the Conservation Statute and by orders of the Commissioner for a public purpose in the interest of conserving the natural resources of the State. Owners of mineral servitudes, therefore, are charged by law with knowledge of the conservation laws, and it must be concluded in law that they tacitly agreed to acquire their mineral servitudes subject to pre-existing lawful regulations governing their use. It follows from this premise that what these mineral servitude owners urge us to classify as an obstacle is really no obstacle for it does not prevent the use of their servitude, it merely controls the method of user. Any detriment to the mineral servitude owner resulting from regulation of his method of user, such as permitting only one well in a unit and depriving a servitude owner of the right to drill another well on his tract in the unit, is compensated for by the benefits which he derives. Examples are the good faith drilling anywhere within the unit resulting in user interrupting liberative prescription and prolonging the life of his servitude, and *293 the right to a prorata participation in any production from the unit even though the well is not drilled on the servitude tract, benefits which the servitude owner would not receive without the conservation law.
The conservation law and regulations promulgated pursuant thereto also seek to prevent economic waste and waste of the servitude owner’s minerals underlying the tract; and they are designed to assure the greatest ultimate recovery from the pool— another advantage to all concerned.
We think this result is more compatible with the unitization concept in our conservation law than the announcement in the Boddie case, and it is a more logical extension of other decisions of this court wherein we recognized that where the drilling of a well on a unit results in commercial production of oil or gas, the production has the effect of extending the primary term of the leases affecting all tracts within the unit and interrupts prescription accruing against any mineral servitude within the unit. Jumonville Pipe and Machinery Co. v. Federal Land Bank of New Orleans, 230 La. 41, 87 So.2d 721 (1956) ; Le Blanc v. Haynesville Mercantile Co., 230 La. 299, 88 So.2d 377 (1956).
Denying the existence of an obstacle said to result from an order of the Department of Conservation creating nondrilling areas in a unit, as in this case, is consonant with the public policy of this State which does not favor unwarranted extensions of liberative prescription on mineral servitudes ; but, to the contrary, that policy favors the timely return of outstanding minerals to the owner of the land.
Also, it should be observed that the Conservation Statute does not contemplate that the Commissioner may only create one-drilling unit at a time, rather it contemplates that in many instances the better practice requires that he create a pattern of units-for the entire area which “appears to be underlaid” by the reservoir, in order to. properly space the wells throughout the reservoir and secure a proper pattern of drainage. (See Hussey, supra.) Under theBoddie opinion obstacles would exist affecting all servitude tracts situated within-the non-drilling areas of the units in the entire pattern of units until the nondrillingareas were abolished or until production was obtained within the unit. In some instances this would take years, for all units-in a field pattern cannot be drilled at once. The undesirable effect of suspending prescription as to servitudes within the non-drilling areas of the units in the entire drilling pattern until they are either drilled or abolished is obvious.
We hold that there was no obstacle to-the exercise of plaintiffs’ servitude on Lots 2 through 6, and the servitude in their favor affecting those lands has expired for nonuser.
*295 Accordingly, for the reasons assigned above, though the rationale of our decision differs, the judgment of the Court of Appeal, Third Circuit, is affirmed.
FOURNET, C. J., and McCALEB, J., dissent with written reasons.