IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

No. 00-31024

CENTRAL PINES LAND CO; TOWER MINERALS COMPANY INC; JACK E LAWTON,
JR; EVELYN GAY LAWTON DUHON; LINDA LEW LAWTON DROST; D S & T INC;
DROST & BRAME INC

Plaintiffs-Appellants-
Cross-Appellees,

versus

UNITED STATES OF AMERICA,

Defendant-Appellee-Cross-
Appellant,

versus

TEXACO EXPLORATION & PRODUCTION INC; SONAT EXPLORATION CO;
CHESAPEAKE OPERATING INC; C H C GERARD; UNION PACIFIC RESOURCES CO,

Defendants-Appellees.

Appeals from the United States District Court
for the Western District of Louisiana

November 28, 2001

Before HIGGINBOTHAM, BARKSDALE, and STEWART, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

The law of mineral rights in Louisiana differs from that of
common law states. In Louisiana, these rights do not exist as a
separate, perpetual estate in land, but can only be held separate
from the surface land in the form of a mineral servitude.[1] The

---

[1] *Frost-Johnson Lumber Co. v. Salling's Heirs*, 91 So. 207, 245 (La. 1920).

servitude gives its holder the right to enter the property and extract the minerals.[2] Louisiana law has consistently recognized that a mineral servitude may expire, or prescribe, after 10 years of non-use.[3] While parties cannot contract to extend the prescriptive period, they may shorten the term of the servitude.[4]

Louisiana Act 315 of 1940 created a special rule for prescription of mineral servitudes when the surface property is owned by the United States:

> When land is acquired by conventional deed or contract, condemnation or expropriation proceedings by the United States of America, or any of its subdivisions or agencies from any person, firm, or corporation, and by the act of acquisition, order, or judgment, oil, gas or other minerals or royalties are reserved, or the land so acquired is by the act of acquisition conveyed subject to a prior sale or reservation of oil, gas, or other minerals or royalties, still in force and effect, the rights so reserved or previously sold shall be imprescriptible.[5]

The current form of Act 315 extends this treatment of the United States to the State of Louisiana and its subdivisions.[6]

---

[2] *Id.*

[3] *See Leiter Minerals, Inc. v. California Co.*, 132 So.2d 845, 851 (La. 1961) (citing provisions of the Louisiana Civil Code and case law recognizing the 10-year prescriptive period). The Mineral Code now governs prescription of mineral servitudes and retains the 10-year prescriptive period. La. Rev. Stat. § 31:21.

[4] *See Leiter Minerals*, 132 So.2d at 852 ("If a servitude is established for 10 years or less, it will remain in force for the time so stipulated regardless of whether it is used by the servitude owner. In such a case no question of prescription arises ....").

[5] 1940 La. Acts 315.

[6] La. Rev. Stat. § 31:149.

Today we deal with the applicability of Act 315 to certain privately-held mineral servitudes on land now owned by the United States in Vernon Parish, Louisiana. Appellants sought declaratory relief and to quiet title in the servitudes when the United States began leasing mineral rights on this land.[7] The holders of the mineral servitudes appeal the district court's grant of summary judgment in favor of the United States, holding that Act 315, as a matter of federal common law, cannot be applied retroactively to prevent prescription of mineral servitudes when the United States obtained the surface estate before 1940. The United States cross-appeals the district court's grant of summary judgment applying Act 315 prospectively, rendering mineral servitudes imprescriptable if the United States obtained the surface estate after the adoption of Act 315. We conclude that summary judgment was appropriately granted in both instances and affirm.[8]

---

[7] Jurisdiction in the district court was based on 28 U.S.C. § 1346(f), which provides exclusive original jurisdiction to federal district courts for actions under 28 U.S.C. § 2409a to "quiet title to an estate or interest in real property in which an interest is claimed by the United States." 28 U.S.C. § 1346(f).

[8] Judge Stewart concurs in the judgment only.

I

In 1929 Gulf Lumber Company conveyed to S.H. Fullerton mineral rights in a 100,000 acre tract located in Vernon Parish, Louisiana. This created a mineral servitude which was eventually transferred to Wm. T. Burton Industries (Burton). Through a series of later mesne conveyances, Appellants Central Pines Land Co., Tower Minerals Company, Inc., Jack E. Lawton, Jr., Evelyn Gay Lawton Duhon, Linda Lew Lawton Drost, D, S, & T, Inc., and Drost & Brame, Inc. acquired all of the rights of Burton.

The parties have adopted the designations of three parcels of the land as Groups A, B, and C. In four transactions between 1933 and 1938, the U.S. Forest Service acquired the Group A and B lands pursuant to the Weeks Forestry Act.[9] The Forest Service, between 1941 and 1952, granted to the U.S. Army all of the Group A and B lands for use as military training grounds.

Burton acquired complete title to the Group C lands in 1937, thereby terminating the 1929 servitude with respect to these lands. Burton sold those lands to the United States in a series of transactions between 1942 and 1981. In each of these transactions, Burton reserved mineral rights, creating a new mineral servitude. Appellants are the successors in interest to these mineral rights in the Group C lands.

---

[9] 16 U.S.C. § 515.

Between 1952 and 1970, the United States, through condemnation, instituted a mineral moratorium which prevented the owners of the mineral servitude from entering portions of the Group A and B lands and exercising their rights. This moratorium did not affect all of the lands burdened by the servitude, although exactly which lands were affected is disputed. In 1967, in an attempt to clarify which lands were covered by the moratorium, the Army and Forest Service divided the land into two areas of "Intensive Use" and "Limited Use." All access was prohibited on Intensive Use land, which was used for artillery practice and as a bombing range. The Limited Use area was under the control of the Forest Service between 1967 and 1978.

During the moratorium Burton was paid a small fee in compensation on a per acre basis for the part of the servitude that was inaccessible for mineral operations. The moratorium was terminated on March 31, 1978. The last drilling on the servitude occurred in 1964 and was performed by Pan American Corporation pursuant to a lease with Burton. Burton's last well was drilled in 1956 and was dry.

In 1992, the U.S. Bureau of Land Management began granting mineral leases allowing exploitation of minerals under Group A and B lands. Appellees Texaco Exploration & Production, Inc., Sonat Exploration Co., Chesapeake Operating, Inc., C.H.C. Gerard, and Union Pacific Resources Co. are the current lessees of these mineral rights. Appellants filed this suit seeking to quiet title

5

to the mineral servitudes on the entirety of the Group A, B, and C lands and a declaration that any leases granted by the United States were invalid.  Both parties moved for summary judgment.

The district court granted summary judgment to the Government holding that Act 315 could not be applied retroactively to render the 1929 servitude, which still covered the Group A and B lands, imprescriptible.[10]  After determining that the pre-1940 Louisiana law of prescription, with a 10-year prescriptive period, would apply, the district court held that there was no suspension of prescription by obstacle after the moratorium ended in 1978.  The district court also held that the moratorium, even when in effect, was not sufficient to suspend prescription because it did not cover all the land subject to the servitude.  As a result, the 10-year prescriptive period had run, and the servitude on the Group A and B lands, had prescribed for non-use.  The district court also granted summary judgment to Appellants, holding that Act 315 could be applied prospectively to the Group C servitude and that it was therefore imprescriptible.

II

_____

[10]  The Louisiana Supreme Court has held that Act 315 should be applied retroactively.  *Whitney Nat. Bank v. Little Creek Oil Co.*, 33 So. 2d 693, 696 (La. 1947).

6

We review the district court's grant of summary judgement *de novo*.[11]

We address first the issue of the applicability of Act 315 both retroactively and prospectively. We reach four distinct legal conclusions: 1) federal common law governs this decision; 2) Act 315 cannot be borrowed as the rule of decision for application to pre-1940 transactions, because it is hostile to the interests of the United States in the operation of default legal rules in place at the time of contract, but it may be applied prospectively; 3) we will use residual Louisiana law as the federal rule of decision for pre-1940 transfers; and 4) precisely because it is no longer hostile to a federal interest in application of default rules in place at the time of contract, Act 315 can be borrowed as the federal rule for the Group C servitudes. We will explain each conclusion in turn.

A

The parties dispute whether the Supreme Court's decisions in *Clearfield Trust Co. v. United States*[12] and *United States v. Little Lake Misere Land Co.*[13] require application of federal common law to this case. We are persuaded that *Little Lake* controls and that

---

[11] *Starkman v. Evans*, 198 F.3d 173, 174 (5th Cir. 1999).

[12] 318 U.S. 363 (1943).

[13] 412 U.S. 580 (1973).

federal common law must both govern the choice-of-law determination and supply the rule of decision.

When a federal court sits in diversity, *Erie R.R. Co. v. Tompkins*[14] requires the application of state substantive law absent a congressional grant of authority to fashion federal common law. This principle applies to other statutory grants of jurisdiction, such as 28 U.S.C. § 1346(f),[15] upon which the district court's jurisdiction rested in this case, though in actual practice with less force. Rejecting a narrow view of *Erie* and the Rules of Decisions Act,[16] the Supreme Court has held that even without an explicit statutory grant of authority, the fashioning of federal common law may still be appropriate when duties and rights of the United States are at issue.[17] After all the Rules of Decisions Act itself ends with the qualifying phrase "in cases where [state laws] apply."[18] *Little Lake* recognized that federal common law governed when a transaction of the United States "aris[es] from and bear[s]

---

[14] 304 U.S. 64 (1938).

[15] *See, e.g., Little Lake*, 412 U.S. at 591 ("The federal jurisdictional grant over suits brought by the United States is not in itself a mandate for applying federal law in all circumstances.").

[16] 28 U.S.C. § 1652 ("The laws of the several states, except where the Constitution or treaties of the United States or Acts of Congress otherwise require or provide, shall be regarded as rules of decision in civil actions in the courts of the United States, in cases where they apply.").

[17] *Clearfield Trust*, 318 U.S. at 575.

[18] 28 U.S.C. § 1652.

heavily upon a federal regulatory program."[19]  Factual similarity

between *Little Lake* and this case counsels us to pause and explore

*Little Lake* in detail.

In *Little Lake*, the United States sued to quiet title in two

adjacent parcels in Cameron Parish, Louisiana that it acquired under

the Migratory Bird Conservation Act.[20]  Both parcels were obtained

by the United States before Louisiana adopted Act 315.  While no

mineral servitude existed before the Government acquired these

parcels, in both the 1937 act of sale and the 1939 judgment of

condemnation, the "seller," Little Lake Misere, *reserved* mineral

rights.

In the transactions at issue in *Little Lake*, the default

prescriptive period of 10 years was shortened by the terms of the

reservation.  The mineral servitudes were to continue

> ... as long [after an initial ten-year period] as oil,
> gas, sulphur, or other mineral is produced ... or so long
> thereafter as [Little Lake] shall conduct drilling or
> reworking operations thereon with no cessation of more
> than sixty (60) days consecutively until production
> results; and, if production results, so long as such
> mineral is produced.[21]

---

[19] *Little Lake*, 412 U.S. at 592.  *See also Texas Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 641 (1981) (noting that federal common law governs when the "rights and obligations of the United States" are at issue).

[20] 16 U.S.C. § 715 *et seq.*

[21] *Little Lake*, 412 U.S. at 583.

Furthermore, if the initial ten-year period ended and no production was occurring, or if operations subsequently ceased for more than 60 days, it was provided that

> the right to mine, produce and market said oil, gas, sulphur or other mineral shall terminate ... and the complete fee title to said lands shall thereby become vested in the United States.[22]

The result of this language was that after 10 years had elapsed from the date of the transfer, any 60 day period of non-production would terminate the mineral servitude.

Little Lake Misere argued that state law should apply and therefore that Act 315 rendered the mineral servitudes imprescriptible. This Court agreed, basing our decision on a prior case involving Act 315, *United States v. Nebo Oil*,[23] where we held that retroactive application of Act 315 did not violate, among other things, the Contract Clause of the U.S. Constitution. The Supreme Court reversed, holding that federal law governed the choice-of-law decision and refusing to borrow Act 315 as the federal rule of decision because the Court found it was "hostile" to the federal interests at stake.[24]

The Court held that application of federal common law was required under *Clearfield Trust* because "the right of the United

---

[22] *Id.*

[23] 190 F.2d 1003, 1007-11 (5th Cir. 1951).

[24] *Little Lake*, 412 U.S. at 597 (finding application of Act 315 retroactively "plainly hostile to the interests of the United States").

States to seek legal redress for duly authorized proprietary transactions 'is a federal right.'"[25] The Court explicitly noted that *Little Lake* involved "the interpretation of a land acquisition agreement (a) explicitly authorized, though not precisely governed, by the Migratory Bird Conservation Act and (b) to which the United States is a party."[26]

The parties in this case dispute whether or not there is such a federal right at issue. Central Pines argues that since the servitude in this case was not *created* by the land acquisition agreement, but rather by the 1929 deed between Gulf Lumber and S.H. Fullerton, there is no federal right at issue. The Government points out that Central Pines relies on the presence of the United States as a party to the *acquisition* in order to obtain the benefits of Act 315 but then denies that this participation by the United States (as opposed to the United States being a party to the creation of the mineral servitude) is relevant for the *Clearfield Trust* determination.

Whether or not the United States bargained over the creation of the servitude, the acquisition subject to the existing servitude created a federal interest in the potential prescription of the mineral servitude conveyed by the 1929 deed via the rule of

---

[25] *Id.* at 593 (quoting Henry J. Friendly, *In Praise of Erie-And of the New Federal Common Law*, 39 N.Y.U. L. Rev. 383, 410 (1964)).

[26] *Id.* at 594.

11

prescription in place at the time of contract.[27]  This is evidenced by the bargaining over this "mere expectancy," apparently invalid, whereby the vendor attempted to reserve it to himself rather than let it pass to the United States upon prescription for non-use.[28] Appellants misconceive the thrust of *Little Lake*.  While the Court stated that it was interpreting the land acquisition agreement,[29] the parties did not dispute the meaning of the *terms* of the agreement, but rather the application of Act 315 and its effect on the interests of the United States.  The same is true here—the parties do not dispute the meaning of the 1929 deed, but instead disagree over the application of Act 315.

Turning to the federal interest at stake in *Little Lake*, we find fundamental similarities.  Appellants insist that the federal right at issue in *Little Lake* was a contractual right of the United States.  True, but a contractual right to what?  The term at issue

---

[27] This "interest" is not recognized as a vested property interest as a matter of Louisiana law.  *See Nebo Oil*, 190 F.2d at 1006-08 (rejecting Contract Clause challenge to Act 315 because such rights are not vested).  The Supreme Court held that this was not relevant to the federal choice-of-law determination. *Little Lake*, 412 U.S. at  602 ("It is also of no import that, under Louisiana law as it might be articulated in 1973, the United States acquired from respondents only the reversion to a mineral interest of indefinite duration, a 'hope' or 'expectancy' revocable at any time by after-enacted legislation.").

[28] In the 1936 and 1938 transfers, the following language was used: "This sale is made subject to the sale of oil, gas ....  Subject to the above mineral sales and rights of any and all persons thereunder [the rights of Burton] there are specifically reserved *to the vendor* [Gulf Lumber Company] for a period of twenty-five (25) years from December 31, 1936, the right to mine ...." Appellants claim that this attempted reversion of the possibility of prescription of the servitude belonging to Burton was invalid.  *See infra* note 42.

[29] *Little Lake*, 412 U.S. at 594 ("We deal with the interpretation of a land acquisition agreement.").

12

in *Little Lake* in effect set the prescriptive period for the reserved mineral servitude. The Government's contract "right" was to obtain the mineral rights after the *contractual* prescriptive period had elapsed. Similarly, in this case the Government's right is to obtain the mineral rights after the *default* prescriptive period has elapsed. This right, as in *Little Lake*, is federal—though arguably weaker because it arises from a default rule.

Appellants urge us to find that *Little Lake* did not overrule our prior decision in *Nebo Oil*, and that *Nebo Oil* held that Act 315 may be retroactively applied to mineral servitudes such as these, where the United States was not a party to the creation of the servitude. However, *Nebo Oil* holds only that the "mere hope" or "expectancy" in the prescription of mineral rights is not protected by the Contract Clause of the U.S. Constitution,[30] and that the retroactive application of Act 315 does not violate the Due Process Clause of the Fourteenth Amendment or dispose of United States property in violation of Article IV, Section 3, clause 2.[31] *Nebo*

_____

[30] U.S. Const. Art. I, § 10, cl. 1.

[31] *Nebo Oil*, 190 F.2d at 1008. This Court has examined the constitutionality of Act 315 numerous times, in fact. In the saga of *Leiter Minerals, Inc. v. United States*, 329 F.2d 85 (5th Cir. 1964) (*Leiter Minerals II*), which generated two opinions from this Court, one from the Supreme Court, and an advisory opinion from the Louisiana Supreme Court, we held that *Clearfield Trust* did not require the application of federal common law to a factually indistinguishable dispute about the retroactive application of Act 315. *Id.* at 90. However, the Supreme Court vacated our opinion as moot. *United States v. Leiter Minerals, Inc.*, 381 U.S. 413 (1965). We reaffirmed the holding of *Leiter Minerals II* in *Little Lake*, 453 F.2d at 362, which, of course, was subsequently

13

*Oil* also does not hold that the rights protected by the Contract Clause are coextensive with those federal interests that a) require application of federal common law under *Clearfield Trust* and b) preclude the borrowing of state law as the rule of decision. The Government does not claim that the Contract Clause prohibits Act 315 from being applied retroactively, presumably because our prior opinion in *Nebo Oil* would render such an argument meritless, but instead that *Clearfield Trust* and *Little Lake* foreclose application of Act 315 as a matter of federal common law. Thus, we need not decide that *Nebo Oil* has been implicitly overruled by *Little Lake* en route to finding that Act 315 cannot be applied retroactively to the servitudes at issue under *Little Lake*.

B

Having determined that a federal rule of decision should be fashioned, we must decide whether to borrow state law. We have stated that

> [b]asic considerations of federalism, as embodied in the Rules of Decision[s] Act, prompt us to begin with the premise that state law should supply the federal rule unless there is an expression of legislative intent to the contrary, or, failing that, a showing that state law conflicts significantly with any federal interests or policies present in this case.[32]

reversed by the Supreme Court on *Clearfield Trust* grounds. *Little Lake*, 412 U.S. at 590-91 n.8.

[32] *Georgia Power Co. v. Sanders*, 617 F.2d 1112, 1115-16 (5th Cir. 1980) (internal citation omitted) (citing *Wallis v. Pan Am. Petroleum Corp.*, 384 U.S. 63, 68, 86 (1966)); *see also*, *Atherton v. FDIC*, 519 U.S. 213, 218 (1997) ("Such

14

Refusing to apply state law is appropriate when national uniformity is required,[33] as well as when state law conflicts with federal interests.[34] The application of state law may in some instances so strongly conflict with federal interests that it can be rejected without further analysis.[35] However, if state law only arguably interferes with federal interests, then the state's interests in application of its own rules must be weighed.[36] This allocation of what is "national" to the preemptive federal order and what is "state" to that domain is the implementing process for maintaining the symmetry of *Clearfield Trust* and *Erie*.

Again *Little Lake* bears most heavily on this analysis. In *Little Lake*, after determining that federal common law should govern the case, the Court decided that Louisiana law could not be borrowed as the rule of decision. Noting that "specific aberrant or hostile

a conflict is normally a precondition" to the application of a special federal rule. (internal quotation marks omitted)); *O'Melveny & Myers v. FDIC*, 512 U.S. 79, 85-86 (1994) ("Our cases uniformly require the existence of such a conflict as a precondition for recognition of a federal rule of decision.").

[33] *See Clearfield Trust*, 318 U.S. at 367 (holding that uniform federal rule should apply in action by United States on a guaranty made on a federal check); *United States v. Standard Oil Co.,* 332 U.S. 301, 305-06 (1947) (selecting uniform federal rule governing recovery of United States for injury to U.S. serviceman by third-party tortfeasor).

[34] *See, e.g., United States v. Kimbell Foods, Inc.,* 440 U.S. 715, 718 (1979) (holding that state law should be adopted as federal rule for establishing priority between competing federal and private liens since uniform federal rule was not necessary to protect federal interests).

[35] *See Georgia Power Co.*, 617 F.2d at 1118 (citing *Little Lake*, 412 U.S. at 580).

[36] *Id.* (citing *United States v. Yazell*, 382 U.S. 341, 351-53 (1966) (holding that federal interest in collection of loan must yield to state interest in family law represented by law of coverture)).

15

state rules do not provide appropriate standards for federal law," the Court held that Act 315 "[a]s applied to a consummated land transaction under a contract which specifically defined conditions for prolonging the vendor's mineral reservation ... deprives [the United States] of bargained-for contractual interests."[37]

Appellants focus upon the Court's repeated reliance on the contractual terms at issue in *Little Lake* to distinguish the facts of this case.[38] The 1933 deed in this case contains no specific mineral reservation and merely states that the United States takes subject to the 1929 servitude. The 1936 and 1938 transfers were subject to what Appellants allege are invalid attempts by the vendor to reserve the interest in possible prescription of a third-party's mineral rights.[39] Thus, none of the pre-1940 transfers contain specific contractual terms setting the duration of the servitude. In fact, they could not have such terms, because the United States was not contracting with the party that held the servitude.

The *Little Lake* Court described the explicit contractual terms in that case in contradistinction to terms that are "less detailed

---

[37] *Little Lake*, 412 U.S. at 596-97 (citing *De Sylva v. Ballentine*, 351 U.S. 570, 581 (1956)).

[38] *Id.* at 597 (referring to "specifically defined conditions," "bargained-for contractual interests," and "explicit terms"); *see also id.* at 602 ("After-the-fact modification of *explicit contractual terms* would be adverse to the United States and contrary to the requirements of the Migratory Bird Conservation Act." (emphasis added)).

[39] *See supra* note 27, *infra* note 42.

and specific."[40]   The Court noted, in dicta, that without a contractual term setting out the conditions under which the United States would obtain the mineral rights, "it might be said that the Government acknowledged and intended to be bound by unforeseeable changes in state law."[41]   Appellants claim that all three of the pre-1940 transactions are "less detailed and specific" than the terms in *Little Lake*.  Since the United States was not contracting with the party that held the mineral rights in these transactions, it could not explicitly bargain or contract for the termination of those rights.[42]

Nevertheless, there is a conflicting federal interest—that in obtaining the mineral rights via the default rule of prescription in place before Act 315.  Appellants argue that there is no conflict because there is no independent federal interest in acquiring mineral rights by prescription—if there were, then the laws of the remainder of the states, which allow for a separate perpetual mineral estate would be in "conflict" with this federal interest.

---

[40] *Little Lake*, 412 U.S. at 602.

[41] *Id*. at 602-03.

[42] Appellants ask us to, at a minimum, distinguish the 1933 deed from the others because it does not contain specific language about the fate of the mineral rights after prescription for non-use.  The 1936 and 1938 transfers all contain attempted "reversions" by which the surface land owner attempted to reserve the mineral rights in the event of prescription.  Appellants allege that this attempt was invalid as a mater of Louisiana law.  We do not need to reach any of these questions, as we find that even the 1933 deed, in its contemplation of the existence of mineral rights, is sufficiently detailed and specific to satisfy *Little Lake*.  Since we believe that the federal interest here is comparable to the contractual interest in *Little Lake*, we decline to read the Supreme Court's dicta in *Little Lake* so broadly.

17

This misconceives the problem, failing to address it at the proper level of abstraction: the application of default legal rules in place at the time of contract. Appellants' putative parade of horribles about the invalidation of the property law of the states in which perpetual mineral estates are allowed is only a parade.

The federal interest here is arguably not as powerful as the federal right to enforce explicit contractual terms, which was present in *Little Lake*, and therefore this case invites balancing of state and federal interests to determine whether the state rule should apply.[43] An assessment, however, of the state interests in the retroactive application of Act 315 has already been performed by the Supreme Court in *Little Lake*. The main justification offered for Act 315 is that it was meant to facilitate federal land acquisitions by allowing vendors to retain their mineral rights indefinitely, as they could in other states.[44] The Court noted that this justification has no bearing on retroactive application of Act 315, because an acquisition cannot be facilitated by a law not yet in existence.[45] The Court also rejected the other justifications offered by the Louisiana Supreme Court in its advisory opinion in

---

[43] *See Little Lake*, 412 U.S. at 599 ("Conceivably, our conclusion might be influenced if Louisiana's Act 315 of 1940, as applied retroactively, served legitimate and important state interests the fulfillment of which Congress might have contemplated through application of state law.")

[44] *Id.*

[45] *Id.*

18

*Leiter Minerals, Inc. v. California Co.*[46]: subjecting federal mineral interests to Louisiana mineral conservation laws and clarification of the taxability of the mineral interests held by private parties when the United States owned the surface land.[47]

We believe that any state interest in the retroactive application of Act 315 does not outweigh the federal interest in this case. Therefore the borrowing of state law as the federal rule of decision is here inappropriate. We now turn to the content of the federal rule of decision and conclude that, while we may not borrow current Louisiana law in the form of Act 315, residual (pre-1940) Louisiana law should provide the federal rule of decision for pre-1940 transactions.

C

The Court in *Little Lake* concluded that although Act 315 could not provide the federal rule of decision, a decision of whether or not to choose pre-1940 Louisiana law (10-year prescriptive period) or to fashion a new rule of federal common law was unnecessary because the terms of the land acquisition contract controlled.[48] Those express terms limited the length of the servitude.

---

[46] 132 So.2d 845 (La. 1961).

[47] *Little Lake*, 412 U.S. at 599-601.

[48] *Id.* at 604 ("Neither rule is the law of Louisiana yet either rule resolves this dispute in the Government's favor. The contract itself is unequivocal....").

19

In this case there are no express terms governing the prescription or termination of the 1929 servitude in the 1933, 1936, or 1938 transfers.  As a result, this Court must decide whether to apply residual (pre-Act 315) Louisiana law or to fashion a different rule of federal common law.  The nature of the federal interest we have identified requires the selection of residual Louisiana law.  Just as the express terms of the contract determined the outcome of *Little Lake*, so should the pre-1940 default rule of prescription provided by Louisiana law determine the outcome of this case.  Thus, a 10-year prescriptive period is the appropriate federal rule of decision.

D

The Government cross-appeals the district court's determination that Act 315 can be applied prospectively to post-1940 transfers.  The Government's position is that we should not borrow Act 315 as the federal rule of decision for the post-1940 transfers under our *Clearfield Trust* analysis.  Both parties appear to accept that if the choice-of-law decision for pre-1940 application of Act 315 is federal, so is the choice-of-law decision for post-1940 transfers.

An interest in the application of the pre-Act 315 legal rule cannot be in conflict with the prospective application of Act 315.  After its adoption, Act 315 provides the background rule that the United States bargained under.  Without "significant conflict"

20

between the application of state law and the federal interest asserted, state law should be borrowed as the rule of decision.[49] The only other federal interest on which the Government could rely—the interest in adding funds to the Treasury—has been recognized by the Court to be insufficient.[50] As a result, unless Act 315 is constitutionally infirm, it renders the servitudes on the Group C lands, which were created after 1940, imprescriptible.

## III

The Government argues that Act 315 unconstitutionally discriminates against the United States and therefore cannot be applied retroactively *or* prospectively. The district court held that the doctrine of intergovernmental immunity posed no bar to the application of Act 315. While we are sympathetic to the Government's argument, we are foreclosed from considering the constitutionality of Act 315 as discriminatory against the United States by our prior decision in *United States v. Little Lake Misere Land Co.*[51] This decision was reversed by the Supreme Court in

---

[49] *See O'Melveny & Myers* 512 U.S. at 85-86 ("Our cases uniformly require the existence of such a conflict as a precondition for recognition of a federal rule of decision.").

[50] *United States v. Burnison*, 339 U.S. 87, 91-92 (1950).

[51] 453 F.2d 360 (5th Cir. 1971) ("As to the contention that Lousiana's Act 315 is hostile to the United States, we note the same principle applies to acquisitions by the State of Louisiana ... and that the act really does nothing more than place citizens of Louisiana in the same position as citizens of other states whose land has been purchased or condemned by the United States. We hold, therefore, that Act 315 is not unconstitutional.").

21

*Little Lake*, but the Court did not address our holding that Act 315 was *not* invalid as discriminatory against the United States.[52]

It is well-established in this circuit that one panel of this Court may not overrule another.[53] While easily confused with traditional *stare decisis,* "our rule that one panel cannot overturn another serves a somewhat different purpose of institutional orderliness."[54] This Court stated in *United States v. Kirk*[55] that "[i]t is the practice of this Circuit for three-judge panels to abide by a prior Fifth Circuit decision until the decision is overruled, expressly or implicitly, by either the United States Supreme Court or by the Fifth Circuit sitting en banc."[56] *Kirk* itself demonstrates that our panel opinion in *Little Lake* binds us on the issue of Act 315's alleged discrimination against the United States, despite its reversal by the Supreme Court.[57] In *Kirk*, the

---

[52] *Cf. Little Lake*, 412 U.S. at 606-08 (Rehnquist, J., concurring) (arguing that Act 315 does impermissibly discriminate against the United States).

[53] *Barrientes v. Johnson*, 221 F.3d 741, 780 n.30 (5th Cir. 2000).

[54] *Montesano v. Seafirst Commercial Corp.*, 818 F.2d 423, 425-26 (5th Cir. 1987).

[55] 528 F.2d 1057 (5th Cir. 1976).

[56] *Id.* at 1063. *See also Causeway Med. Suite v. Ieyoub*, 109 F.3d 1096, 1103 (5th Cir. 1997) ("Accordingly, for a panel of this court to overrule a prior decision, we have required a Supreme Court decision that has been fully heard by the Court and establishes a rule of law inconsistent with our own.").

[57] In order to hold differently on the issue of Act 315's alleged discrimination against the United States, we would have to overrule *Kirk*, which we cannot do, of course.
    This case illustrates the important difference between our treatment of a panel opinion after *vacatur* by the Supreme Court and our treatment when a judgment is reversed on other grounds. While our prior opinion in *Leiter*

defendant argued that a jury instruction, which had previously been approved by this Court in *United States v. Rogers*,[58] was improper. The decision in *Rogers,* however*,* had been reversed by the Supreme Court on other grounds.[59] Nevertheless, this Court in *Kirk* held that the decision of the *Rogers* panel was still binding, because the Supreme Court had not explicitly or implicitly overruled our panel opinion.[60]

IV

Having concluded that Act 315 cannot be applied retroactively to the transfers of the Group A and B lands, we must decide whether or not the servitudes affecting those lands have prescribed under the residual rule of Louisiana law that allows prescription after 10 years of non-use. Appellants argue that various acts of the

---

*Minerals II* did not bind the *Little Lake* panel because it was *vacated*, the opinion in *Little Lake* binds us because only the *judgment* was reversed on other grounds. *Little Lake*, 453 F.2d at 362 (reaffirming principles of *Leiter Minerals II* in face of Government's argument that it had no precedential value); *Ridley v. McCall*, 496 F.2d 213, 214 (5th Cir. 1974) (stating that vacated opinions have no precedential value); *Durning v. Citibank, N.A.*, 950 F.2d 1419, 1424 n.2 (9th Cir. 1991) ("A decision may be reversed on other grounds, but a decision that has been vacated has no precedential authority whatsoever.").

[58] 488 F.2d 512 (5th Cir. 1974), *rev'd on other grounds*, 422 U.S. 35, 41 (1975). The Supreme Court held that an improper communication between judge and jury had occurred, necessitating reversal. 422 U.S. at 40-41.

[59] *Rogers*, 422 U.S. at 36.

[60] *Kirk*, 528 F.2d at 1063. The fact that then Justice Rehnquist agreed that Act 315 discriminated against the United States does not change our determination that our opinion in *Little Lake* is still binding. Two justices in *Rogers* concurred and reached the merits of the question, arguing that our decision should be overruled. *Rogers*, 422 U.S. at 43-48 (Marshall, J., concurring).

United States operated to legally suspend prescription, such that the 10-year period has not run. We are persuaded that no obstacle existed after the moratorium ended in 1978 and that in any event an obstacle must cover the entirety of the land subject to the servitude before it can suspend prescription as a matter of Louisiana law. We therefore affirm the district court's holding that the servitudes on the Group A and B lands have prescribed for non-use.

A

Appellants first claim that the doctrine of *contra non valentum agere nulla cirrut praescriptio*[61] should apply to suspend prescription when the owner of the servient estate "impedes" or "hinders" the servitude owner's access to the servitude. The Government argues that the controlling provisions of the Mineral Code (formerly of the Civil Code) govern the suspension of prescription by obstacle.

Under Louisiana law, an obstacle will suspend prescription if the servitude owner is "prevented from using [the servitude] by an obstacle that he can neither prevent or remove."[62] This is nearly identical to the corresponding provision of the Civil Code that

---

[61] "Prescription does not run against one unable to act." *See Cartwright v. Chrysler Corp.*, 232 So. 2d 285, 287 (La. 1970).

[62] La. Rev. Stat. § 31:59.

governed until the adoption of the Mineral Code in 1975.[63]   The district court held, and we agree, that since a) the Mineral Code of 1975 generally applies retroactively and b) the two provisions are identical, the Mineral Code should be applied as the law of prescription in this case.[64]

The Louisiana Supreme Court has stated that statutory prescription is an "example" of the doctrine of *contra non valentum*.[65]   Nevertheless, Appellants urge that the general Louisiana law of *contra non valentum* be applied as an addition to the statutory and case law on prescription of mineral servitudes. This extension of *contra non valentum* is not supported by the case law cited by the Appellants.   In *Plaquemines Parish Commission Council v. Delta Development Co.*,[66] Plaquemines Parish sued to regain title to mineral interests, arguing that they had been wrongfully expropriated by corrupt public officials.   The defendants argued that those interests had prescribed under the 10-year period applicable to claims of breach of fiduciary duty.   The court invoked *contra non valentem* because the defendants' concealment prevented

---

[63] See La. Civ. Code. art 792 (1870) ("If the owner of the estate to whom the servitude is due, is prevented from using it by any obstacle which he can neither prevent nor remove, the prescription of non-usage does not run against him as long as this obstacle remains.").

[64] *See* La. Rev. State. § 31:214 (stating that Mineral Code is to be applied retroactively unless it would "divest already vested rights, or [] impair the obligation of contracts").

[65] *McDonald v. Richard*, 203 La. 155, 165 (La. 1943).

[66] 502 So.2d 1034 (La. 1987).

25

the plaintiffs from discovering their claim. [67] Similarly, in *Nathan v. Carter*[68] the defendants' fraud and misrepresentation prevented plaintiff from discovering a cause of action for wrongful death. The Louisiana Supreme Court applied *contra non valentem* on these facts.[69] The Appellants present no evidence of fraud, concealment, or bad faith on the part of the Government. *Delta Development* and *Nathan* are therefore inapposite.

B

A look at even an abbreviated chronological account of the use of the servitude persuades us that it has prescribed. The last active drilling on the servitude land was in 1964 and was performed by Pan American as a lessee of the servitude. The 10-year period of non-use required for prescription of a mineral servitude can be interrupted when the holder of the mineral servitude, in good faith, engages in operations on the land.[70] These operations, however, must be more than mere "[p]reparations for the commencement of actual drilling or mining operations, such as geological or geophysical exploration, surveying, clearing of a site, and the hauling and erection of materials and structures necessary to

---

[67] *Id.* at 1060-61.

[68] 372 So.2d 560 (La. 1979).

[69] *Id.* at 562-63.

[70] *Mire v. Hawkins,* 186 So. 2d 591, 595-96 (La. 1966); *see also* La. Rev. Stat. Ann. § 31:29(1). Interruption differs from suspension. *See infra* note 74.

conduct operations .... "[71]  It is undisputed that the Appellants did not interrupt the prescriptive period by drilling at any time after 1964.

An obstacle to the use of a servitude will suspend prescription.[72]  Since Appellants present no evidence of use of the servitude since 1964 the only way they can prevail is by demonstrating that an obstacle created by the Government denied them access to the servitude lands for a total length of time of approximately 22 years from March 20, 1964, when Pan American plugged its well,[73] to the filing of this lawsuit in 1996.[74]

The moratorium on entry to the lands comprising the Fort Polk artillery range (most of the Group B lands and 40-50% of the Group A lands) ended on March 31, 1978.  In the time since, neither Appellants nor their predecessor, Burton, engaged in any drilling, so they must show that there was some other obstacle that suspended the prescriptive period.  Appellants claim that after the moratorium

---

[71] La. Rev. Stat. § 31:30.

[72] La. Rev. Stat. § 31:59.

[73] A lessee's use of the servitude suffices to interrupt prescription as against the servitude owner.  *Taylor v. Dunn*, 97 So. 2d 415, 419 (La. 1957).

[74] An obstacle causes the prescriptive period to be suspended, whereas use of the servitude causes the prescriptive period to be interrupted.  The difference is as follows: suspension merely "stops the clock," which begins to run again when the obstacle is removed.  Interruption, by contrast, "resets the clock" so that when operations cease, a full 10 years must elapse until prescription.  *See Louviere v. Shell Oil Co.*, 440 So.2d 93, 97 n.8 (La. 1983); La. Civ. Code arts. 3466, 3472.  This distinction is not very important to this case, because use (which would constitute an interruption) has not occurred since 1964.  Appellants need only to show that obstacles to their (and Burton's) use of the servitude existed over an approximately 22 years in aggregate.

was lifted the U.S. Army instituted a de facto moratorium that prevented them from making use of the servitude, but do not offer sufficient evidence to survive summary judgment on this issue.[75] Burton had notice of the end of the moratorium,[76] and the Army allowed others to enter the lands for the purpose of performing geological surveys, including Shell Oil, which did so on the basis of a permit granted by Burton.

There is also no evidence that Burton or Appellants drilled or even attempted to enter the servitude lands after the moratorium ended. Nor did they request permission to do so from the Army. Shell Oil shot seismic lines on the servitude lands under a permit from Burton after the moratorium had ended. The record provides us with no evidence that, after the moratorium ended, the United States created an obstacle to use of the servitude lands. Thus, we have no difficulty concluding that Appellants failed to create a genuine issue of material fact on the question of obstacle. As a result, we find that the mineral servitude terminated by prescription at some time before 1996.

C

---

[75] Appellants' main evidence on this point is the impression of one John Camp, an agent of Burton's, that, despite explicit statements to the contrary about whether drilling would be allowed, the Army conveyed the message that "there ain't going to be no drilling on this reservation."

[76] The moratorium payments that had been made by the Army to Burton ended as of March 31, 1978. This provided notice to Burton that use of the servitude would now be allowed.

Even assuming that a de facto moratorium prevented the Appellants from accessing the servitude after 1978, Appellants must still explain why a partial obstacle is sufficient to suspend prescription. The moratoriums (both real and alleged) indisputably did not cover all of the Group A and B lands, but rather most of the Group B lands and 40-50% of the Group A lands. All that remains is to determine Louisiana law on partial obstacles and the suspension of prescription.

In *Hanszen v. Cocke,*[77] the Louisiana Court of Appeals held that litigation over one portion of land subject to a mineral servitude did not suspend prescription of the servitude because other portions of it were still available for exploitation.[78] The litigation in that case is analogous to the alleged de facto moratorium in this case: each forecloses operations on only a portion of the land burdened by the servitude. Appellant replies that *Hanszen* was incorrectly decided and we may refuse to follow an intermediate state appellate court when its decision does not represent the likely result in the state's highest court.[79]

This argument relies on a questionable reading of the Louisiana Supreme Court's decision in *Boddie v. Drewett*,[80] a case overruled

---

[77] 246 So. 2d 200 (La. App. 1st Cir. 1971)

[78] *Id*. at 206.

[79] *Hulin v. Fibreboard Corp.*, 178 F.3d 316, 328 (5th Cir. 1999).

[80] 87 So. 2d 516 (La. 1956).

ten years later in *Mire v. Hawkins*.[81]  In *Boddie* the court held that a drilling order of the Department of Conservation prohibiting drilling on the entirety of a 12 acre tract of land subject to a mineral servitude constituted an obstacle that suspended prescription.  The court refused to hold that the drilling of a dry hole in good faith *outside* the tract burdened by the servitude but *inside* the drilling unit constituted use that would interrupt the prescriptive period.[82]  However, this was precisely the theory the court elected to adopt in *Mire*, overruling *Boddie* and declaring that the Department of Conservation's drilling orders could *not* be obstacles that would suspend the prescriptive period.[83]  However, operations anywhere within the drilling unit would be a use of the servitude (thus interrupting prescription) even if these operations were not on the tract subject to the servitude.[84]  Nothing in *Boddie* or *Mire* explicitly addresses whether or not a partial obstacle is sufficient to suspend prescription.

Appellants, however, argue that one of the holdings of *Boddie* is that a partial obstruction is sufficient to suspend prescription. This can be deduced, they believe, from the fact that the drilling order in *Boddie* only affected certain "sands" (geological formations

---

[81] 186 So. 2d 591 (La. 1966).

[82] *Boddie*, 87 So. 2d at 518.

[83] *Mire*, 186 So. 2d at 289.

[84] *Id.*

at particular depths) rather than all sands.[85]  Since the *Mire* Court reversed on other grounds (that Department of Conservation orders cannot be obstacles), Appellants argue that this holding of *Boddie* remains good law.

We disagree.  The Department of Conservation's order in *Boddie* covered the only useful "sand" under the tract in question, meaning it was not a partial obstacle in any real sense.  Moreover, this partial obstacle argument is not addressed by the Louisiana Supreme Court in *Boddie*, and we will not question *Hanszen*'s interpretation of Louisiana law on this basis.  Thus, following *Hanszen*, no obstacle sufficient to suspend prescription has ever existed over the Group A and B lands.

We AFFIRM.

---

[85] *Boddie*, 87 So. 2d at 519.